Joanne **FIELDER**, Plaintiff–Appellant,

v.

**UAL CORPORATION, a Delaware corporation, dba United Airlines, Defendant–Appellee.**

No. 98–35511.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1999

Filed July 10, 2000

Thad M. Guyer, Medford, OR, for the plaintiff-appellant.

Robert E. Bluth, Medford, OR, for the defendant-appellee.

Before: ALDISERT*, KLEINFELD and W. FLETCHER, Circuit Judges.

Opinion by Judge ALDISERT; Concurrence by Judge W. FLETCHER; Dissent by Judge KLEINFELD.

ALDISERT, Circuit Judge:

This appeal by Joanne Fielder from summary judgment entered by the district court, a magistrate judge presiding, presents questions of hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Issues raised by Appellant require us to decide (1) whether conduct by non-supervisory or non-managerial fellow workers may constitute actionable retaliation by the employer, a question of first impression in this court, (2) whether her claim is barred by the 300–day statute of limitations from the date the conduct occurred, 42 U.S.C. § 2000e–5(e)(1) ("[A] charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . ."), or is still viable because

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

of a continuing policy and practice of discrimination or retaliation and (3) whether she is estopped from asserting a claim of constructive discharge because her resignation was not timely.

Appellant Fielder filed claims of sex discrimination, retaliation and constructive discharge against her employer, UAL Corporation, dba United Airlines. The court determined that her claims were barred by the statute of limitations and that she was estopped from asserting her constructive discharge claim because she did not timely resign. We disagree. We hold that Appellant has presented sufficient facts that give rise to genuine issues of material fact relating to statutory limitations in presenting her discrimination claims and the timeliness of her resignation.

The district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. The parties executed written consents for entry of final judgment by a magistrate judge. 28 U.S.C. § 636(c). This court has jurisdiction under 28 U.S.C. § 636(c)(3) (appeal from magistrate judge) and 28 U.S.C. § 1291. The appeal was timely filed under Rule 4(a), Federal Rules of Appellate Procedure.

Summary judgment is appropriate when the "admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure; *see Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472 (9th Cir.1989). We review motions for summary judgment *de novo. Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105 (9th Cir.1998).

## I.

We must set forth in some detail the historical and narrative background of an unfortunate, if not sordid, employment relationship between Ms. Fielder and United Airlines. She began working at United Airlines in Medford, Oregon on October 23, 1978 as a permanent, part-time customer service agent ("CSA"). Her general duties included flight preparation, handling baggage, taking reservations and seating passengers. She took a furlough from 1981 until June 1984. After returning, she continued to work for almost ten years, until April 20, 1994, when she was placed on medical leave at her request.

The record indicates that Fielder had been subject to sexual harassment for a long period of time during her employment. The series of incidents commenced when her co-worker, M.C.,[1] began to sexually harass her. She testified that he would frequently touch her shoulder, back, arms or hips while on the job. As early as 1991, she told him explicitly to stop touching her and that if he continued, she would obtain legal counsel and pursue a claim against him. *Id.* However, he continued this offensive conduct. In one incident, he pinned her to a departure board with his back and wiggled his rear end against her. In another incident, he picked her up and, ignoring her screams, twirled her around so hard she became ill. She has assigned no particular dates to these incidents.

On February 13, 1993, while she was checking in passengers, M.C. leaned over to her and asked her to go to bed with him. He did this in front of numerous customers during one of the busiest periods of pre-flight preparation. The public nature of this act prevented her from responding or reacting. She went home immediately after checking in her passengers. That night M.C. made the last of three obscene phone calls that he had made to her home during the period from mid–1992 to February 1993. During his third call, he repeatedly asked her if she was naked and he told her he wanted to "eat" her. Five days later, Fielder report-

---

**1.** Because this matter will go to trial, we have decided not to refer to certain parties by their names.

ed the sexual harassment to her supervisor, Ted Bibler. Her complaint alleged unwanted touching and harassing phone calls-allegations M.C. denied when Bibler confronted him with the complaint.

A few days later, M.C. confessed to the police that he had placed the obscene phone calls, and as a result entered into a criminal diversion agreement in July 1993. After she reported him, but before the July 1993 diversion agreement, Bibler did little to protect her from M.C. Furthermore, Bibler told her not to discuss the incident with her co-workers. Conversely, M.C. was allowed to discuss the incident, and he was able to convince their co-workers that he was in the right. About once every two weeks, Fielder asked Bibler to stop both M.C.'s continuing harassment and the retaliations she was receiving from her co-workers. She alleges that Bibler did very little to assist her and refused to

prevent M.C. from working her shift.[2] She consulted an attorney who wrote two letters on March 11, 1993 and April 7, 1993 to Bibler demanding that he not allow M.C. to bid onto Fielder's shift.[3]

Included in M.C.'s diversion agreement was a no-contact-with-Ms. Fielder requirement, which mandated that he could not work the same shift as Fielder. However some contact was inevitable, especially during shift changes.

Bibler gave M.C. the strongest reprimand possible short of termination-a final written warning. However, Fielder testified that Bibler was unsupportive of her during the diversion agreement, and that M.C. was allowed to bid onto her shift on a number of occasions. It was only at her insistence that he was removed. Sometimes he was not removed until the night before the shift.

2.  Fielder explained the working environment and her response to it in her deposition:

    > Ted [Bibler] would constantly say, Joanne, I can't make them like you. As if he could do nothing, would do nothing, to enforce what I considered the company's responsibility to provide a decent working environment, so I could check in those busy flights and do those gate operations.... From the time I came forward, until the diversion agreement, [M.C.] was trying to bid on my shift. And I was scared to death of [M.C.]. And each and every time, in order to keep from working on my shift, I had to go to [my attorney].... I had to get letters, which I could take back to United Airlines, which said: Don't put this guy on her shift until this matter has been settled.
    >
    > That is something I perceived as hostility and lack of support and protection from my company.... I, the person who came forward to report this crime, was put at odds with my co-workers.... Ted also informed me not to say anything about this situation to any of my coworkers.
    >
    > And I quote, he said it would polarize the office. Well, immediately started to retaliate against me, when I came forward that day to report him.... [He put] my ex-husband's return address in the front of his mailbox.... But went and told the other agents what had happened. And people seemed to be taking his side.
    >
    > Sides were taken at the very beginning, before any of the information, as I had been

    > told, was even put out. Ted didn't want anyone to know about it. And then they were ganging up against me, as if I had been overreacting or something.... I was afraid, yet I was told to say nothing. Meanwhile the rumor mill grinds on, and Ted does nothing. Plaintiff Depo. at 200–202.

3.  Her attorney's April 7, 1993 letter read:

    > [M]y client is extremely concerned about this situation, given the fact that in your letter you indicated that [M.C.] may be reassigned to Ms. Fielder's shift in the very near future. As you are aware, a criminal charge has been filed against [M.C.], which directly relates to his dealings with Ms. Fielder. At this point, [M.C.] has a court appearance scheduled for May 3, 1993 on that criminal charge. That court appearance may or may not be the end of the court proceedings.
    >
    > It is important for you, as Ms. Fielder's supervisor, and United Airlines, as her employer, to be aware that her emotional condition cannot, and will not, tolerate any contact with [M.C.] under these circumstances. The difficulty which has been created with regard to scheduling is the result of [M.C.'s] actions, not those of my client. A risk does occur that returning [M.C.] to Ms. Fielder's shift could lead to an occupational injury claim on her part as a result of the stress that this situation would place on her.
    >
    > Letter from Mueller to Bibler of 4/7/93, at 1.

Other female employees complained to Bibler about M.C.'s behavior, including a complaint about an obscene phone call. Despite other complaints about M.C.'s conduct, Fielder contends that she was ostracized for reporting him to their supervisor. Joe Rossi, a co-worker, testified that other employees shunned her. While she was working, they would often refuse to answer technical questions she raised. As a result, she was less able to adequately perform her job. Fielder testified that various other incidents occurred, including an episode where she left her coat at the office and came back the next day to find it wadded up in the corner with muddy footprints on it.

Fielder states that S.R. was particularly retaliatory towards her. He was her coordinator and the employee who acted as manager in the manager's absence. He would punish fellow employees who displeased him by withholding required job assistance. For example, two workers, a CSA and the load planner, are required to unload baggage from a plane. It was S.R.'s job as the load planner to help unload the plane. If a co-worker displeased him, he would withhold this assistance.

Fielder alleged that S.R. sexually harassed her on a number of occasions, *see* Plaintiff Depo. at 82, 158–159, and that S.R. made comments towards Fielder and other women employees as having "great boobs," and "I wouldn't use anyone else's cock up her." Plaintiff Depo. at 158–159. After Fielder reported S.R.'s conduct, he would withhold his plane-loading assistance. *Id.* at 161. S.R. also withheld job assistance for her after she put M.C. on report. *Id.* at 193–194.

Fielder's attorney wrote two more letters, dated June 9, 1993 and September 3, 1993, which formally informed Bibler of the retaliatory working environment that had developed towards Fielder. The letters advised Bibler of the hostile treatment and attitudes of other employees towards Fielder.[4] He requested Bibler address the situation and stop the retaliatory conduct of the employees.

The record indicates that the retaliatory acts continued. Rossi testified that co-workers S.R., R.M., A.H. and L.P. became more hostile towards Fielder after she reported M.C.'s harassment. Rossi Depo. at 29. In August 1993, United representative Nellie Yuret held a seminar on sexual harassment at the Medford station. Fielder described employee Bill Bruce as "exploding" at the seminar and accusing her of fabricating the harassment by M.C. Immediately after the seminar, she spoke with Bibler and Yuret and requested that they approve her pending transfer request application, in which she requested a move to Portland or Seattle. Assuming that her transfer application would be granted, she put a bid on a condominium in Portland shortly after the seminar. United challenges this finding, emphasizing there was testimony that Fielder did not want to leave Medford and that she thought the situation would just continue in any city where she transferred.

A co-worker and intermediate supervisor, R.M., screamed at Fielder in front of other employees telling her she had her "head up her ass." Rossi testified that R.M. did this because he blamed her for M.C.'s inability to be on the same shift as

---

4. The pertinent portion of the April 11 letter reads:

Under the United Airlines code of conduct, an employee is to be protected against retaliation for reporting a complaint of sexual harassment. Unfortunately, it appears that United Airlines is failing in this obligation to provide such protection to Ms. Fielder. On several occasions, she has reported to you conduct by other employees that does constitute direct or indirect retaliation against her. The attitude and behavior of Ms. Fielder's co-

employees toward her has changed dramatically since the incident with Mr. [M.C.] has been reported.

It is the obligation of the employer to maintain a workplace that is free of such retaliation and conduct by one employee toward another. On behalf of my client, I would respectfully request that you address this issue with the other employees in the workplace, and see to it that no further conduct of this type occurs in the future.

Letter from Mueller to Bibler of 3/11/93, at 1.

her. He said that on another occasion R.M. told her that she was "neurotic and sick." One day when she walked into the airport coffee shop, R.M. told her to "leave ... [y]ou are not welcome here." Fielder also testified that R.M. delayed a flight to protest M.C. not being able to work the same shift as Fielder.[5]

She testified that the environment was so hostile towards her that she would cry in the restroom almost daily. Cecilia Johnson, a co-worker, agreed that the working environment was stressful and that employees often retaliated against Fielder.[6] Others testified that the environment was generally hostile to women. Rossi claimed that on the ramp, where the work is very physical, some of the men would consistently give the harder work to women.

Fielder went to Bibler and asked him "[p]lease, when the diversion agreement is up, please keep him away from me. I'm very much afraid of him." E.R. at 15. When M.C.'s criminal diversion program was coming to an end, she tried to arrange a meeting with Bibler, M.C. and others to work out an agreement regarding M.C.'s conduct if he were allowed to work on her shift. Fielder testified that she

wanted to iron out some safeguards for me, so that I could feel comfortable with M.C. on my shift. I had finally realized that there was nothing else I could do to keep him off of my shift. So I thought, perhaps, if we have some concrete rules and regulations on paper, that everyone agrees to and signs, that we could work together.

E.R. at 17. Bibler refused to hold the meeting. He told her that M.C. would have to commit some other improper act before United would take any further action to protect her. She made clear that she wanted United to guarantee that she would be physically separated from M.C., free of his harassment and that she would not have to work the gate with him. Bibler refused these demands. *Id.*

Fielder was warned by M.C.'s diversion officer that he is "one of the scariest of his types, because he's smart enough to walk with one foot on both sides of the line." Plaintiff Depo. at 252. Fielder testified that because of that statement and her past experiences, she was extremely worried that he might hurt her. As a result of Bibler's refusal to have the meeting or otherwise guarantee her safety, Fielder

**5.** Fielder explained the working environment and R.M.'s reaction in her deposition:

Q: Other than not being friendly and warm toward you, and not speaking to you, what other problems, if any, were there during this time period [while M.C. was in his criminal diversion agreement]?

A: There was the daily problem of [S.R.] never backing me up on the ramp or the ticket counter. This created a constant environment of—it was hard to do your job when you knew you had to do more than what was your job. I was trying to work very, very fast to make up for the lack of support from my coworkers.

Then there was the incident of [R.M.] delaying the airplane, because [M.C.] wasn't allowed to work an overtime shift. On that morning shift we were actually working one short. There might have only been four people on shift during that flight check in. And [R.M.] was furious because [M.C.] had signed up for the overtime and, because of the diversion agreement, [M.C.] was not allowed to work the shift. Consequently, there was

more work to be spread out over those of us there, than if [M.C.] had been there.
Plaintiff Depo. at 193–194.

**6.** Johnson testified about the work environment in her deposition.

Q: If you had to describe the working environment around the time you left, how would you describe it?

A: Stressful.

Q: Do you recall Joanne ever talking to you about the retaliation that she felt she was getting?

A: Yes.

Q: Did she discuss with you whether or not she had a talk with Ted Bibler about that?

A: Yes. I know that she did talk to Ted at several different times. I think Ted's attitude was sort of: What do you want me to do? That kind of attitude.

Q: Did that surprise you?

A: No.

E.R. at 28.

went on medical leave April 20, 1994. She told Johnson she was leaving and that "there was just too much that had gone on, and she would not work at the Medford station again." E.R. at 27. Because her request for transfer was still pending, it is unclear if Fielder meant she would never work for United again or not in United's Medford station.

Fielder made a successful claim for worker's compensation on August 18, 1994, and the date of injury was listed as April 20, 1994. Thereafter, she began attending rehabilitation therapy sessions approximately three times a week. On September 1, 1994, Fielder returned to the airport to escort her mother onto a United flight. After she boarded the aircraft, Rossi came onto the plane and, in front of the flight attendants, passengers and her mother, told her that Bibler wanted to see her in his office immediately and that there was "some trouble with [her] co-workers with [her] being on the airplane." E.R. at 21.

When she reported to Bibler, he told her she was causing an upheaval at the airport and that she "showed poor judgment coming out to the airport at all." Fielder Depo. at 284. She claims the reprimand was public, because one could hear through his office doors and she saw two of her co-workers standing within a few feet of the door when she left.

Fielder testified that the reprimand left her with the impression that she should no longer go to the Medford airport for any reason. Fielder Depo. at 284. As a result, she did not return to Medford airport; whenever she had to fly, she went to Portland, Eugene or Redding. She testified that she did not want to go to the Medford airport because she believed Bibler's reprimand gave tacit approval to her co-workers to retaliate against her if she returned.[7]

Bibler testified that he spoke with Fielder to explain the frustration other employ-

7. Fielder explained in her deposition her version of what happened the day she was pulled off the flight:

> Q: Your complaint also alleges that you were disciplined for filing the criminal action against [M.C.] How were you disciplined?
> A: I was pulled off of an airplane. I was told that my presence at the airport was causing upheaval among my coworkers, and that I showed poor judgment in coming out to the airport at all. Even though I never once approached the ticket counter to encounter my fellow employees. I proceeded directly to the gate, cleared my access to the aircraft with the gate agent, and then once, again, while wearing my badge at all times, cleared with the A flight attendant on board.
> Since I was told by Mr. Bibler that my presence at the airport was causing such an upheaval, I have not stepped one foot in the Medford Jackson County Airport. I travel now out of Eugene, out of Portland, and out of Redding, whenever I want to go any place. *I have been denied the right and privilege of flying out of Medford Airport by United Airlines.*
> Q: When you say "denied," this is based on your conversation with Mr. Bibler resulting from the day when you were assisting your mother?
> A: That is correct. And also the hostile environment that I know still exists at Unit-

ed Airlines against me, which I know that I would not be—I do not feel that I could check baggage or check into a flight and board an aircraft at this airport free from sabotage, interference, derogatory comments, or other harm.
> Q: What other type of harm?
> A: Being put in a seat which would be uncomfortable. Having someone seated next to me intentionally, who would be offensive. The guys used to do that, put people next to people who would bother other people, just to get even with them. Or delay a bag being checked, or check it someplace and hold it back. Or have some little mistake, which would inconvenience a flight and make it uncomfortable. I know how they feel about me. I'm not going to put myself in harms way or cause problems for myself or for them.
> Q: And you feel that Mr. Bibler's comments to you that day were a disciplinary action?
> A: Yes, I do. Ted set the tone of the office, which said Joanne was reprimanded for being out there, and I was not welcome at that airport.

> . . . . .

> Q: [I ask you if there was anybody else in the office] because your complaint alleges that you were publicly reprimanded and harassed for assisting your disabled mother onto the airline.

ees felt because she came to the airport while on medical leave to assist her mother onto a flight. He claimed that he did not know her mother was disabled or that she was helping her onto the aircraft. He simply thought she went with her mother to talk to her and see her off. However, he admitted there is no policy against an employee seeing off a relative.[8]

Rossi testified that employees have an informal practice of escorting their family

> A: Well, [S.R.] and [R.M.] and [A.H.] had gone to Ted [Bibler]. They all saw me go in there to talk to Ted. The walls are thin. When I came out, [two co-workers], I believe were standing within two or three feet of the door. You can hear through the door.
> Q: So even though you were in an office with a closed door, you feel you were publicly reprimanded and harassed?
> A: Yes, because I was *publicly pulled off of that airplane* in front of other passengers, whom I knew. And in front of my mother, who was very upset by that incident. That was very embarrassing. And in front of the flight attendant that I had gained access from. Yes.

Fielder Depo. at 283–286 (emphasis added).

8. Bibler also testified about the incident in his deposition:

> Q: And what if anything did you do at that point?
> A: Joe [Rossi] was working at the time, and I said—you know, because of Joanne—I said, I know it's very awkward, but if she has a moment or two, I'd really like to talk to her. And Joanne came into my office after her mother left, I believe. And I said, you know, I recognize your rights Joanne, but, you know, it is a very sensitive issue in the office, and just be aware. And she got very defensive, and the conversation basically ended. I think it was probably only a minute or two long and she left the office very upset.
> Q: What is the practice when an employee of United Airlines has a relative who may be disabled or may need assistance? What is the practice with that?
> A: I didn't know her mother was disabled. Is she? I don't know.
> Q: Well, in general, say for example.
> A: I don't know of any employee in the office—it is not a practice to go on the airplane and talk to relatives, that I'm aware of. To say it's never happened, I don't know.

members onto flights. He also admitted that he typically escorts his children onto aircrafts.

United did not act on Fielder's transfer request. Instead, in Fall 1994, United transferred another worker to Seattle, Johnson, who had less seniority than Fielder. Johnson testified that she was amazed how quickly her request was approved.[9] On May 10, 1995, Fielder's doctor released her to go back to work on the condition that she not work at United.

> Q: Is it a practice to assist relatives onto the plane, just assist?
> A: Not that I'm aware of.
> Q: And did Joanne ever admit to you that she had been just sitting there talking to her mother on the airplane? Did she tell you what she had been doing?
> A: Yes. She was talking to her mother is what she said, seeing her mother off.
> Q: Were your concerns more that other *people were upset* or that *Joanne was violating* some policy that you thought–
> A: My concern was more with the sensitivity of trying to get this employee group to work together and try and understand one another, as opposed to a violation. *I'm sure other employees had probably done similar things, and so forth, but I was just concerned about the process.*
> Q: Is there a policy against assisting?
> A: A policy? No. I would say that there is—there is certainly not a policy to do it. To say that it's never been done or that it has been done, I can't say. But it's certainly not a policy to do it routinely.

Bibler Depo. at 39–42 (emphasis added).

9. Johnson explained her transfer and Fielder's intention to move in her deposition:

> Q: At the time you moved up and transferred to Seattle, what was your seniority as compared to Joanne's?
> A: She had probably about four more years that I do. That's just a guess. But I know that she does have quite a few more years than I do.
> Q: Do you remember whether or not she discussed transfer before or after you put your transfer request in?
> A: It had to have been before, because when I put my transfer in, it was—to me, it was just amazing that it went through so quickly. And I wasn't actually even prepared for it, but I did it.
> Q: Did she ever discuss purchasing—"she" meaning Joanne—discuss purchasing a condo in Portland?

On May 9, 1995, Fielder filed an unlawful employment practices complaint against United with the Oregon State Bureau of Labor and Industries and on October 25, 1995, a complaint in the district court. The court granted United's motion for summary judgment and dismissed the case because the discrimination had not taken place within the 300–day limitations period and Fielder's resignation was not timely to qualify as constructive discharge.

## II.

Before a suit may be filed under Title VII, 42 U.S.C. § 2000e, a plaintiff must either file a complaint with the Equal Employment Opportunity Commission within 180 days of the alleged violation or within 300–days if the plaintiff initially instituted proceedings with the appropriate state agency. 42 U.S.C. § 2000e–5(e)(1); *see also Mueller v. Los Angeles Fire Dep't*, 637 F.2d 616, 617 (9th Cir.1980).

Because Fielder filed an unlawful employment practice complaint with the Oregon State Bureau of Labor and Industries on May 9, 1995, it is the 300–day period that we must address. We recognize and emphasize that this limitations period covers those incidents that occurred between July 14, 1994 and May 9, 1995. Conduct that took place prior to the period is not actionable unless the continuing violation theory applies, *see Draper*, 147 F.3d at 1107, and it is this theory that commands our attention here.

[A] systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period. The reason is that the continuing system of discrimination operates against the employee and violates his or her rights up to a point of time that falls within the applicable limitations period....

A: Yes.
Q: Do you remember when that was?
A: No. I know that one time we went to Portland, and we drove by a place that she had looked at with her mother.

*Green v. Los Angeles Cty. Superintendent of Sch.*, 883 F.2d 1472, 1480 (9th Cir.1989) (citing cases).

█ A plaintiff satisfies the continuing violation doctrine when he or she shows a "continuing policy and practice of discrimination on a company-wide basis" and that "[the] policy and practice operated at least in part within the limitation period." *Id.* It applies also when a plaintiff alleges a "series of related acts, one or more of which falls within the limitations period" and when only a few discriminatory acts took place during the limitations period, but these acts were part of an ongoing unlawful employment practice. *Id.*

Fielder alleges that a company-wide policy and practice of discrimination resulted in a hostile work environment, contending that her manager, Bibler, contributed to the hostile work environment and that United failed to remedy the hostile work environment created by M.C. and her co-workers in violation of 42 U.S.C. § 2000e–2 (sex discrimination). The mere presence of her harassers in the workplace, she argues, maintained the hostile work environment during the limitations period and thus comes within the rubric of a continuing violation theory.

Fielder also alleges that she was subject to a series of related discriminatory and retaliatory acts, because her managers or supervisors retaliated against her and encouraged employee retaliation against her for reporting sexual harassment in violation of 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice...."). Fielder claims that she is permitted to sue for previous acts of discrimination, not just for those that fell within the limitations period, because the

Johnson Depo. at 60–61.

conduct prior to July 14, 1994 was sufficiently related to subsequent events.

■ To survive a motion for summary judgment for failure to satisfy the period of limitation requirement, a plaintiff must raise "a genuine issue of disputed fact as to the existence of a continuing violation," *Draper*, 147 F.3d at 1108, and must also "demonstrate that a genuine issue exists as to whether the violation continued into the relevant period of limitations." *Id.* Fielder is required to raise a sufficient question as to whether the sex discrimination and retaliation that occurred prior to July 14, 1994 continued into the 300–day period.

Because the legal elements of the various Title VII violations-hostile work environment and retaliation-are different, "[w]e consider the allegations with respect to each theory separately, in determining whether any of the events underlying these claims occurred within the relevant period of limitations." *Id.*

### III.

■ We now must meet a threshold question of whether conduct by co-workers who are not supervisors may impose liability on the employer on a retaliation claim, a question that is open in this court. Clearly, employers may be held vicariously liable for hostile work environments created by supervisors. *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.

*Id.* at 524 U.S. at 765, 118 S.Ct. at 2270. We must now decide if an actionable hos-

tile work environment can be created by lower-level employees.

■ In *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998), the Court of Appeals for the Tenth Circuit concluded that employers may be liable for retaliation by co-workers, because adverse employment actions are not limited to ultimate employment decisions. The court explained that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim." *Id.* To decide whether we should adopt this approach, we may look for guidance in decisions from other courts. Adverse employment actions include "employer actions such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and *toleration of harassment by other employees*." *Wyatt v. Boston*, 35 F.3d 13, 15–16 (1st Cir.1994) (emphasis added); *see also Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) ("Nothing indicates why a different form of retaliation-namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII-does not fall within the statute.").

We are of the view that the interpretation of an adverse employment action as expressed by the Courts of Appeals of the First, Seventh and Tenth Circuits is consistent with the plain language of 42 U.S.C. § 2000e–3, which makes it "unlawful to discriminate against any ... employees." As the *Wideman* court explains, "the term 'discriminate' is not limited to 'ultimate employment decisions.' " *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998). If the statute were to be interpreted in a strict manner, employers could retaliate at will so long as the retaliation does not constitute an ultimate employment decision or rise to the level of a constructive discharge. *Id.* Because we have traditionally recognized the vital remedial role of Title VII, we hold,

therefore, that Title VII's protection against retaliatory discrimination extends to employer liability for co-worker retaliation that rises to the level of an adverse employment action.

## IV.

We now must decide the crucial question of whether Appellant met her burden of setting forth sufficient facts of a hostile work environment to constitute a genuine issue of material fact to preclude summary judgment against her. Her contention is anchored on the theory that the events that took place after the 300–day time period came within the rubric of the continuing violation theory.

■■■ A hostile work environment exists when a plaintiff shows; "(1) that he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) that this conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 875–876 (9th Cir.1991). We examine elements of these claims from the perspective of a reasonable person of the victim's gender-here, from the perspective of the "reasonable woman." *Id.* at 883.

"A 'hostile work environment' occurs when there is a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper*, 147 F.3d at 1108. Most instances of hostile environments are not capable of facile identification. "[I]nstead, the day-to-day harassment [is] particularly significant, both as a legal and a practical matter, in its cumulative effect." *Id.* To satisfy the continuing violation theory, the plaintiff must show that a hostile environment exists and it continued into the period of limitations.

### A.

■■■ We are satisfied that Fielder met the first prong of proving the continuing violation. She ably presented abundant evidence to show a hostile environment, contending that the conduct of her manager, Bibler, fostered an environment that "allowed fellow employees to harass, defame and discriminate" against her. Employers may be held vicariously liable for failing to remedy sexual harassment by employees when management knew or should have known of the harassing behavior. *Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 955 (9th Cir.1999). She alleges that management had actual knowledge of the harassment and retaliation by employees, such as M.C., R.M. and S.R., because she and her attorney brought it to her supervisors' attention a number of times.

Fielder testified that she was subjected to sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature and that M.C. began harassing her in 1991, three years before she went on disability leave. She testified that he touched her shoulder, back, arms or hips while she was on the job and described incidents when M.C. "wiggled" his rear end against her and twirled her around so hard she became sick to her stomach. He also committed phone harassment against her on three separate occasions, which included vulgar sexual propositions and sexually inappropriate comments.

■■■ The Supreme Court teaches that "[t]he correct inquiry is whether [appellant] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation … was voluntary." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). When Fielder threatened to bring legal action against him, she made it clear to M.C. that his conduct was unwelcome. Moreover, the numerous complaints communicated to her supervisor and others made it clear to United that M.C.'s conduct was unwelcome. We now

turn to the second, and more difficult, question: Did the hostile environment continue into the period of limitations?

### B.

■ We have previously reserved the question of whether Title VII limitations period requires an overt "act" within the period or whether the mere presence of the harasser in the workplace is sufficient to give rise to employer liability. *Draper,* 147 F.3d at 1108 n. 1. We have stated that "we reserve decision as to whether requiring such a showing is appropriate in the context of a hostile work environment claim, given that a hostile work environment is ambient and persistent, and that it continues to exist between overt manifestations." *Id.* We do not meet this question here, as urged by Appellant, because we are satisfied that at least two overt acts did take place and they relate to the question of discrimination as well as retaliation. We are persuaded that although we should consider allegations of discrimination and retaliation separately, much of the evidence presented by Appellant is germane to both concepts.

■ We first look to see if the acts during the 300–day period of limitations involve the same type of discrimination as those committed before the period. We must inquire whether there is a common type of discrimination, such as sexual or gender-based harassment, or if there is a common kind of employment action, such as repeated denial of a promotion. *See Waltman v. International Paper Co.,* 875 F.2d 468, 475 (5th Cir.1989); *Glass v. Petro–Tex Chemical Corp.,* 757 F.2d 1554, 1561 n. 5 (5th Cir.1985). Every incident of discrimination before the limitations period need not be of the same type, so long as there is a corresponding type of discrimination within the period.

### C.

The first episode within the relevant period is the reprimand Fielder received from Bibler for escorting her mother onto the plane. This incident may be considered an example of discrimination and has the capacity to reflect co-worker retaliation, employer retaliation and refusal to remedy a hostile working environment. Bibler called Fielder into his office in response to complaints by her co-workers. They may have complained because she was out sick or they may retaliated against her because she reported M.C.'s conduct. It is unlikely that they objected only to the act of escorting her mother onto the plane because, as the record indicates, United employees often escorted their family members onto their airline's flights. It is an issue of a material fact whether these employees sought to have Fielder disciplined for non-discriminatory reasons, i.e., whether they were simply unhappy that she was on sick leave while escorting her mother or whether they were retaliating for her protected activity. So long as the conduct has the capacity of being considered retaliatory, it becomes an issue for the fact finder. Whether Bibler reprimanded Fielder in public in retaliation for making complaints against M.C. or for other reasons is also appropriately a jury question. His admonition could be considered retaliatory because the language he chose, telling her she "showed poor judgment coming out to the airport at all," may have reasonably left Fielder with the impression that she should not go to the Medford airport again. Nevertheless, it could have been for a non-discriminatory reason. It is also a disputed issue of fact whether Bibler's reprimand encouraged retaliatory behavior against Fielder by her co-workers. Fielder had a fear of reprisals from other employees who might purposefully lose her luggage or engage in other retaliatory acts, because they had done these acts in the past and because Bibler's rebuke indicated that Fielder was not welcome at the airport.

If a jury finds that Bibler's reprimand was an act of retaliation, it becomes an issue of fact whether the retaliation was of

the same kind alleged before the 300–day period. The retaliatory acts by management, before the period of limitations, were Bibler's refusal to prevent M.C. from bidding onto Fielder's shift before the diversion agreement, acting manager S.R.'s refusal to give her required job assistance and supervisor R.M.'s screaming at Fielder that she had her "head up her ass," telling her she was neurotic and sick and later telling her she was not welcome in the airport coffee shop. Fielder alleges that the motive behind these acts was retaliation against her for reporting M.C.

It is for the jury to decide also whether the motive for the employee retaliation was the same before and after July 14, 1994. Fielder alleges that employees would refuse to answer her technical questions, thus preventing her from adequately doing her job, that her coat was soiled by co-workers and employee Bruce publicly accused her of lying about M.C.'s harassment during a sexual harassment seminar. There is also testimony from Rossi that the attitudes of Fielder's co-workers became much more hostile towards her after she reported the harassment.

### D.

■ We turn now to United's refusal to transfer Fielder. The refusal to transfer her may be evidence that United failed to take steps reasonably calculated to remedy a hostile work environment, *see Burrell,* 170 F.3d at 955, and this constitutes an overt act. Fielder expressed a willingness to move to a different city so that she could continue to work for United. She offered to remedy the problem by transferring, but United declined to take any action, thereby maintaining the *status quo* hostile environment. The brute fact is that a person with less seniority received the transfer. The transfer issue, too, presents a jury question on the issues of discrimination and retaliation.

### V.

■ Generally, to determine whether the continuing violation doctrine applies, "[the] question ... boils down to whether sufficient evidence supports a determination that the alleged discriminatory acts are related closely enough [to the acts outside the limitations period]." *Green,* 883 F.2d at 1480–1481 (internal quotations and citations omitted). The Court of Appeals for the Fifth Circuit set forth a number of factors to assist in determining the presence *vel non* of a close relationship in *Berry v. Board of Supervisors,* 715 F.2d 971, 981 (5th Cir.1983), but we are not convinced that this analysis is properly suited for a hostile work environment.[10] Rather, we are satisfied with our previous teachings in this respect:

A continuing violation may thus be established by not only demonstrating a company-wide policy of practice, but also by demonstrating a series of related acts against a single individual.... In the later instance, "[the] question ... boils

---

10. *Berry* was an "equal pay" gender discrimination case and it set forth certain factors that may be considered whether discrete acts have the capacity to constitute a continuing violation in such a case. The court emphasized that "[t]his inquiry, of necessity, turns on the facts and context of each particular case" and stated:

Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a bi-weekly paycheck) or more in the nature of

an isolated work assignment or employment decision? The third factor, perhaps of most importance, is the degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of this act is to be expected without being dependent on a continuing intent to discriminate?

*Berry,* 715 F.2d at 981.

Whatever the value of this analysis when comparing compensation according to gender, we are not persuaded that they are appropriately applicable in determining the continuation of a hostile environment.

down to whether sufficient evidence supports a determination that the 'alleged discriminatory acts are related closely enough to constitute a continuing violation.'"

*Green v. Los Angeles County Superintendent of Schools,* 883 F.2d at 1480–1481 (citing *Bruno v. Western Elec. Co.,* 829 F.2d 957, 961 (10th Cir.1987)); *see also Draper,* 147 F.3d at 1109 (refusing to view "snide laughter and humiliating response" as an isolated event without reference to the circumstances in which it occurred in a hostile environment case).

We are satisfied that adopting the rationale in *Green* and *Draper* is sufficient enough for us to conclude here that the two overt acts occurring within the limitations period were so closely related to the acts of discrimination and retaliation previously experienced by Ms. Fielder as to trigger the operation of a continuing violation theory. We are satisfied that considering the totality of circumstances here, the episode relating to escorting her mother onto the plane together with subsequent events relating thereto, and the denial of her transfer request were closely related enough to constitute a continuing violation. Accordingly, we conclude that the district court erred in determining otherwise.

## VI.

We turn now to the question of whether Fielder's charge of constructive discharge was properly dismissed by the district court as being untimely. The court based the dismissal of Fielder's constructive discharge claim on three alternative theories. It first determined that the claim was time-barred because the statute of limitations began to run when Fielder went on medical leave on April 20, 1994, rather than when she failed to return to work after the end of her medical leave on May 10, 1995. To the extent her claim was based on sexual discrimination, it determined that the constructive discharge claim was time-barred because the sexual discrimination by M.C. ended in February 1993. To the extent the claim was based on retaliation, it determined that the claim

was barred because Fielder waited eight months after the alleged reprimand before quitting.

### A.

Subsequent to the magistrate judge's decision in this case, this court held that the limitations period for a constructive discharge claim begins to run on the date of an employee's resignation. *Draper,* 147 F.3d at 1111. Fielder resigned on May 10, 1995. We have said that "[a] constructive discharge occurs when a person quits his [or her] job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." *Id.* at 1110. Constructive discharge takes place when an individual "has simply had enough; [he] or she simply can't take it anymore." *Id.* Fielder has presented ample evidence from which a jury could find an intolerable working environment. Her evidence shows examples of retaliatory acts by her co-workers, such as withholding required help on the job, trampling on her coat with muddy feet and publicly accusing her of fabricating sexual harassment claims. She has also presented evidence of retaliatory acts by management, such as screaming at her in front of her co-workers, allowing co-workers to retaliate against her and allowing M.C. to bid onto her shift. Thus, Fielder has averred sufficient evidence for a jury to find a constructive discharge.

The key issue before this court is whether Fielder's resignation was timely for purposes of constructive discharge. The teaching in *Draper* instructs us that the date of the resignation triggers the limitations period in a constructive discharge case. *Id.* at 1110. We believe that events occurring within the limitations period prior to her resignation on May 10, 1995—accompanying her mother onto the aircraft on September 1, 1994 and the transfer of co-worker Johnson in the fall of 1994—are sufficient to conclude that her resignation was not untimely. We con-

clude, therefore, that the court erred in concluding that she was estopped from asserting this claim.

## B.

■ A question arises as to whether Fielder's constructive discharge claim is barred because it was not part of her complaint, which pre-dated her date of resignation. She filed her Bureau of Labor and Industries complaint on May 9, 1995 and resigned on May 10, 1995. The general rule is that incidents of discrimination that are not included in an EEOC or state agency charge may not be considered by a federal court unless "the new claims are like or reasonably related to the allegations contained in the EEOC charge." *Green,* 883 F.2d at 1475–1476. To determine reasonable relation "the court inquires whether the original EEOC investigation would have encompassed the additional charges." *Id.* "Finally, the remedial purpose of Title VII and the paucity of legal training among those whom it is designed to protect require charges filed before the EEOC to be construed liberally." *Id.*

■ Fielder's constructive discharge claim is reasonably related to the discrimination and retaliation claims that were included in the complaint, because all three claims are based upon the same actions and conduct. Therefore, the administrative investigation should have included the constructive discharge and Fielder has not forfeited her right to pursue it in federal court.

\*   \*   \*   \*   \*   \*

We have considered all contentions raised by the parties and conclude that no further discussion is necessary. We hold that Fielder's claims of sex discrimination and retaliation are not time-barred and she is not estopped from asserting her claim for constructive discharge. We conclude also that there is a genuine issue of material fact whether the events occurring within the 300–day period come under the ambit of the continuing violation period. The judgment of the district court is re-versed and the case is remanded for further proceedings consistent with this opinion.

## REVERSED AND REMANDED

W. FLETCHER, Circuit Judge, concurring:

Judge Aldisert's opinion describes two "overt acts" during the limitations period, either of which is sufficient to render Fielder's filing timely. I write separately to give reasons, in addition to those adduced in Judge Aldisert's opinion, to support the conclusion that Fielder's complaint was timely filed.

I believe that nothing needs to be added to Judge Aldisert's accurate and detailed account of Fielder's attempt to accompany her mother onto the airplane at the Medford Airport, and of the subsequent reprimand by Bibler. I will say only that Fielder and United tell dramatically different versions of that episode. If Fielder's account is believed, as it must be on a motion for summary judgment, Bibler's actions constituted an overt act within the limitations period.

However, I believe it may be useful to add to Judge Aldisert's account of United's failure to grant Fielder's transfer request while granting a transfer request of an employee with less seniority. The dissent maintains that there is no evidence that Fielder's transfer request remained active during the 300–day limitations period, and that the majority is simply "making up facts." In her deposition, Fielder testified that sometime before August 1993 she had put in a request to transfer to Seattle or Portland, and there is no evidence in the record that she ever withdrew that request. I believe that our obligation to draw all reasonable inferences in favor to the nonmoving party compels us to conclude, for purposes of summary judgment, that the transfer request was still pending during the limitations period. *See Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ("[I]n ruling on a motion for summary judgment, the

nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.") (internal quotation and citation omitted).

The dissent further maintains that United's grant of a transfer request made by Cecilia Johnson, a co-worker with less seniority, cannot support a claim of retaliation because Johnson, too, had complained about M.C. According to the dissent, Johnson's complaints about M.C., and her subsequent transfer, show that Fielder's claim of retaliation is groundless. I disagree, for there is evidence in the record showing that Fielder and Johnson were not similarly situated. According to Johnson's deposition testimony, she went to Bibler's office in the wake of Fielder's complaint to tell him "that this was not an isolated incident, that it should be taken very seriously, and that it should not be just brushed off." Johnson did so because she "wanted to make sure that Ted did not think that Joanne was just making it up." Johnson's deposition makes clear that her "complaints" were intended to support Fielder's case, not to press her own. When asked if she complained about M.C. before or after Fielder's incident with M.C., Johnson replied, "Why would I say anything before the incident?" Johnson continued: "My impression was that, after talking to Joanne, Ted wanted to put the whole thing to rest and just let everything that had gone on before—to just be done with it and start over again." Fielder, however, did not want to "be done with it." According to Johnson, Fielder "pushed" the issue. Based on this evidence, a reasonable jury could conclude that United transferred Johnson rather than Fielder because Fielder had complained vigorously and vociferously about sexual harassment while Johnson had not.

KLEINFELD, Circuit Judge, dissenting:

The majority opinion effectively eliminates the statute of limitations on sex discrimination cases. It does this in the face of a Supreme Court decision emphatically reinforcing the short statutory limitations period. Anger at how Fielder's fellow employees allegedly treated her and at her being criticized for helping her mother onto the airplane cannot justify disregarding the law. The practical consequence of the majority opinion is to keep alive incidents of claimed sexual harassment permanently, with no statute of limitations at all.

The statute of limitations is "within three hundred days after the alleged unlawful employment practice occurred."[1] Fielder filed on May 9, 1995. The date 300 days before Fielder's filing date is July 14, 1994. The statute thus requires us to see what sexual harassment (or employer discrimination for making a sexual harassment charge) occurred *during that period.* None did, because Fielder was not even there. Her last day of work was April 20, 1994, before the 300 day period even started. She did not work a single day during the 300 day period, so there was not even an opportunity for sexual harassment or employer retaliation to take place, let alone evidence that any did.

Judge Aldisert writes an emotionally stirring summary of Fielder's allegations about M.C.'s unwanted sexual invitations between mid–1992 and February 1993. Everything with M.C., all the unwelcome sexual conduct, stopped dead in February 1993. In February 1993, over *two years* before Fielder filed her charges in this case, Fielder complained to her supervisor, Mr. Bibler, and to the police, about M.C. Her supervisor, Mr. Bibler, immediately and firmly disciplined M.C. and changed M.C.'s assignment, so that he would not do anything like this again and would be separated from Fielder. Bibler counseled M.C. on appropriate behavior and placed him on "final notice." United Airlines' policy is verbal warning, then written warning, then final notice, then termination, but Bibler skipped over the first two steps of progressive discipline so that M.C. would be fired without further warning if he sexual-

1. 42 U.S.C. § 2000e–5(e)(1).

ly harassed Fielder again. Fielder was asked in her deposition whether there was "anything that Mr. Bibler should have done at that meeting that he didn't do?" and answered "No." The district attorney's office did not prosecute M.C. criminally, as Fielder had sought, but they had him sign a "diversion agreement" in lieu of prosecution for "telephonic harassment," under which he had to avoid contact with Fielder for a year, pay a $100 fine, and continue mental health counseling. Fielder admits that M.C. never again made an unwelcome sexual overture or remark to her after Bibler's discipline of M.C. She has many criticisms of M.C.'s and United's subsequent conduct, e.g., she once saw M.C. in the airport returning a rental car when she was there, and he once "growled" as though angry when he saw her, and sometimes she called management to take him off her shift when they both bid for the same shift (they always removed him at her request). But she has absolutely no allegations that M.C. ever again made any sexual remarks or overtures to her after she complained about them in February 1993.

The 300–day statute of limitations has been interpreted by the Supreme Court quite strictly. In *Delaware State College v. Ricks*,[2] the Supreme Court held that the time ran from when the discriminatory act occurred, denial of tenure, not from the later date when the complainant's job ended. The Court held that this is what the statute means when it says within the time period "after the alleged unlawful employment practice occurred." "It is simply insufficient for Ricks to allege that his termination 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.' The emphasis is not upon the effects of earlier employment decisions;

rather, it 'is [upon] whether any present violation exists.'"[3] "It should not be forgotten that time-limitations provisions themselves promote important interests; 'the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.'"[4] *Ricks* expressly rejected the proposition that the unlawful employment practice was a "continuing violation" so that the limitations period would not start until the job ended.[5]

Today's majority strains to find something within the 300 days preceding filing, and comes up with two events: (1) not granting her a transfer; and (2) telling Fielder that it was not a good idea to board the plane with her mother. Fielder lost her case on summary judgment, not on a 12(b)(6) motion, so it is not enough that some good claim can be imagined on the basis of her complaint. She needs sufficient evidence so that a reasonable jury could find that these occurrences were sex discrimination or company retaliation for bringing a sexual harassment claim earlier.[6] She lacks it.

Fielder has absolutely no evidence that United's failure to grant her request for a transfer (the majority refers to "United's refusal to transfer Fielder" but the record shows no refusal during the 300 days) was sex discrimination or retaliation for filing a sex discrimination complaint. Fielder was not at work at all, not for a single day, during the three hundred day period. United transferred another woman during the 300 days who had also complained about sexual harassment by M.C., so even if there had been a refusal to transfer, Fielder would lack evidence that the refusal to transfer her was retaliation for com-

**2.** *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1981).

**3.** *Id.* at 258, 101 S.Ct. 498.

**4.** *Id.* at 259–60, 101 S.Ct. 498.

**5.** *Id.* at 257, 101 S.Ct. 498.

**6.** *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cline v. Industrial Maintenance Engineering & Contracting Co.*, 200 F.3d 1223, 1228 (9th Cir.2000) (quoting *Anderson*).

plaining about M.C. The majority refers to the "brute fact that a person with less seniority received the transfer," as though that meant something. It does not. What means something is that the transfer went to a woman who was going to work every day, not one who was gone with no assurance of return, and who had also made a sexual harassment complaint about M.C. Fielder submitted no evidence whatsoever to support her accusation that United's failure to transfer her was somehow a discriminatory or retaliatory act.[7]

Nor did Fielder submit any evidence that United knew during the three hundred day period that she even wanted to be transferred. She testified in her deposition that about *a year before* the three hundred day period began, she had complained about the situation to a sexual harassment trainer who was visiting, and that "at that point, I had transfer requests in" which "were active." She submitted no evidence whatsoever that she had any transfer request pending during the three hundred days. Indeed, her friend, the one who also complained of sexual harassment by M.C. and who got the transfer, testified at her deposition that Fielder's talk about a transfer was "short-lived," "she did not want to leave Medford," and she said that "[t]hey are not going to force me out of my home." Thus there is no evidence that Fielder wanted a transfer during the 300

7. Judge Fletcher argues that the transfer of Fielder's friend, Johnson, over Fielder supports a claim for retaliation because "Johnson's ... 'complaints' [of harassment] were intended to support Fielder's case, not to press her own." The record does not support this claimed distinction, even if it would make a difference, which is doubtful. Here is Johnson's deposition testimony:

Q Did [M.C.] ever touch you in a way that made you feel uncomfortable?
A Yes.
Q Would you describe that please?
A There were several occasions when I would be sitting at the desk, and he would come up behind me to rub my neck, and then move his hands down the front of my chest.

. . . . .

Q Did you describe this to Ted Bibler?
A Yes, I think I did.
Q Do you remember when you told Ted Bibler about this?
A No, I don't have a date. I know it was after this had gone pretty far, and it actually looked like nothing was being done. It seemed like everything was being swept under the rug. And I wanted to make sure that Ted did not think that Joanne [Fielder] was just making it up.

This testimony establishes that Johnson complained to get something "done" about M.C.'s harassment of the two of them, and complained specifically about M.C.'s improper conduct toward herself. Bibler's response to Johnson's complaint shows that United regarded her complaints as personal in nature. Johnson testified that "His [Bibler's] reaction was: Has he done anything *to you* recently? And I said, not recently. And he said, I want

to know if he does anything *to you* ever again."

Judge Fletcher also argues that Johnson, unlike Fielder, did not "push[ ] the issue," so that "a reasonable jury could conclude that United transferred Johnson rather than Fielder because Fielder had complained vigorously and vociferously about sexual harassment while Johnson had not." But Johnson says she complained about M.C. because "it actually looked like nothing was being done" and "[i]t seemed like everything was being swept under the rug." That is "pushing the issue." She complained about M.C.'s misconduct directed at herself, and the misconduct toward her stopped. In this regard, she was similarly situated to Fielder, who also did not experience any further harassment from M.C. after she complained and he was disciplined. Nor was this Johnson's first complaint about her male co-workers. She, like Fielder, had complained previously to Bibler about male co-workers "sabatoging" female coworkers by forcing them to lift heavy bags off the belt. Johnson, like Fielder, made multiple complaints about the behavior of her male co-workers toward her. Thus, Johnson's success in getting the transfer is highly probative of the absence of any retaliatory reason for not transferring Fielder, and there is *no* evidence to the contrary.

United had a legitimate business reason for transferring Johnson, but not Fielder. Johnson got the transfer because she was working every day during the relevant time period. Fielder was on sick leave with no guarantee of ever returning, and it was not clear that Fielder's old transfer request was still pending. Fielder bears the burden of presenting specific and substantial evidence that this reason was pretextual, and has no such evidence.

days, and uncontradicted, plausible evidence that she did not want a transfer.[8] The majority is simply making up facts, simply making them up, to concoct a reason to get around the statute of limitations, when it says that "United's refusal to transfer Fielder" during the 300 days was one of "two overt acts" within the 300 days that would "trigger the operation of a continuing violation theory." It is ridiculous to treat an employer as retaliating by refusing a transfer when the employee did not want the transfer and was no longer working, and the employee who got the transfer did exactly the same thing that the "refusal" was supposed to be "retaliation" for. This is result-oriented decision making at its worst. It is also a frightening harbinger for employers making hiring decisions.

The other supposed "overt act" is what the majority characterizes as "discipline" when Mr. Bibler "reprimanded Fielder in public in retaliation for making complaints against M.C." Again, the majority opinion needs correction from the record. The record shows that it was not "public," not a "reprimand," and not employer "retaliation." Fielder has no evidence from which a jury could decide that Fielder's employer publicly reprimanded her in retaliation for her sexual harassment complaint against M.C.

Though the majority suggests that Fielder's supervisor dressed her down in public, both Fielder and the supervisor testified that he spoke to her alone in his office with the door shut. Where a supervisor talks to an employee in his office with the door shut, it is not "public." It is as private as he can make it. Fielder says in

her deposition that she thought it was possible that someone could overhear him if they were right outside his closed door, and that two employees were near his closed door, but she does not even allege that he raised his voice. This evidence does not establish a genuine issue of fact as to whether Mr. Bibler spoke to her publicly; it establishes without contradiction that he spoke to her privately.

Nor is there any evidence whatsoever that this conversation was, as the majority characterizes it, a "reprimand" by which Fielder was "disciplined." Two people were there, Bibler and Fielder. Here is what Mr. Bibler, the supervisor, testified to about what he said:

Q Some time around September of '94, do you recall a situation where you had requested that Joanne come off of a plane and talk with you in your office?

A Yes, I do recall that.

Q Could you tell me how you came to know that she was even on the premises?

A Either two or three employees came into my office saying that Joanne [Fielder] was—I don't recall the specific dates—but Joanne [Fielder] was seeing her mother off on a trip. I wanted her to realize how frustrating it is for them. Number one, they routinely do not go on airplanes. And number two, she hadn't been to work for a number of weeks. They were just frustrated by that process.

Q Was one of those individuals Stan Reynolds?

8. Judge Fletcher's concurring opinion argues that we must treat the transfer requests as being active during the limitations period because of our obligation to draw all reasonable inferences in favor of the nonmoving party. But such an inference is not reasonable in light of Johnson's uncontradicted testimony that Fielder's interest in the transfer was "short-lived." Our duty to draw all reasonable inferences in favor of the nonmoving party does not permit us to draw an inference in the face of undisputed evidence to the

contrary. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that inference drawn must be reasonable in light of competing inferences); *In re Citric Acid Litig.,* 191 F.3d 1090, 1094 (9th Cir. 1999); *Sylvia Development Corp. v. Calvert Cty,* 48 F.3d 810, 818 (4th Cir.1995). Once Fielder developed the feeling that "they are not going to force me out of my home" by transferring her, the only reasonable inference is that her transfer request was dead.

A   No.

Q   Do you recall who they were?

A   Liz, I believe was one. And I believe the other one was Anita Hatton. And if there is a third one, I can't recall. Those are the two that I remember.

Q   Did they come together or separately?

A   I think they were together. There were two or three employees in my office at once. It was just a passing comment.

Q   And what if anything did you do at that point?

A   Joe [Rossi] was working at the time, and I said—you know, because of Joanne [Fielder]—I said, I know it's very awkward, but if she has a moment or two, I'd really like to talk to her. And Joanne [Fielder] came to my office after her mother left, I believe. And I said, you know, I recognize your rights Joanne [Fielder], but, you know, it is a very sensitive issue in the office, and just be aware. And she got very defensive, and the conversation basically ended. I think it was probably only a minute or two long and she left the office very upset.

Q   What is the practice when an employee of United Airlines has a relative who may be disabled or may need assistance? What is the practice with that?

A   I didn't know her mother was disabled. Is she? I don't know.

Q   Well, in general, say, for example.

A   I don't know of any employee in the office—it is not a practice to go on the airplane and talk to relatives, that I'm aware of. To say it's never happened, I don't know.

Q   Is it a practice to assist relatives onto the plane, just assist?

A   Not that I'm aware of.

Q   And did Joanne [Fielder] ever admit to you that she had been just sitting there talking to her mother on the airplane? Did she tell you what she had been doing?

A   Yes. She was talking to her mother is what she said, seeing her mother off.

Q   Were your concerns more that other people were upset or that Joanne [Fielder] was violating some policy that you thought—

A   My concern was more with the sensitivity of trying to get this employee group to work together and try and understand one another, as opposed to a violation. I'm sure other employees had probably done similar things, and so forth, but I was just concerned about the process.

Q   Is there a policy against assisting?

A   A policy? No. I would say that there is—there is certainly not a policy to do it. To say that it's never been done or that it has been done, I can't say. But it's certainly not a policy to do it routinely.

Bibler further described the occurrence in his affidavit:

I did have a conversation with Joanne Fielder in my office, with the door closed, regarding her being at the airport to assist her mother on a flight while being off work on medical leave. While Joanne was on medical leave, she was allowed to bid her shift. Inasmuch as she was not at work, that shift was one employee short. Her presence at the airport caused concern to other employees in that she was able to come to the airport to assist her mother onto a flight, however, claimed not to be able to work. I discussed the need for sensitivity in regard to co-workers feelings in this matter with Joanne. She was not reprimanded for assisting her mother onto a flight.

This evidence establishes that Mr. Bibler acknowledged that Ms. Fielder was within her "rights" ("I recognize your rights"), but asked her to "be aware" that her going onto the plane was "a very sensi-

tive issue in the office." Far from reprimanding her, he asked her to respect "the need for sensitivity in regard to co-workers feelings," because they were working one person short on her shift while she was staying out on medical leave. She did not agree on "the need for sensitivity in regard to co-workers feelings," which he conceded was within her "rights."

Fielder's testimony does not establish a genuine issue of fact as to whether she received a disciplinary reprimand in this conversation. Here is her deposition testimony:

Q Your complaint also alleges that you were disciplined for filing the criminal action against [M.C.]. How were you disciplined?

A I was pulled off of an airplane. I was told that my presence at the airport was causing upheaval among my coworkers, and that I showed poor judgment in coming out to the airport at all. Even though I never once approached the ticket counter to encounter my fellow employees. I proceeded directly to the gate, cleared my access to the aircraft with the gate agent, and then once, again, while wearing my badge at all times, cleared with the A flight attendant on board.

Since I was told by Mr. Bibler that my presence at the airport was causing such an upheaval, I have not stepped one foot in the Medford Jackson County Airport. I travel now out of Eugene, out of Portland, and out of Redding, whenever I want to go anyplace. I have been denied the right and privilege of flying out of Medford Airport by United Airlines.

Q When you say "denied," this is based on your conversation with Mr. Bibler resulting from the day when you were assisting your mother?

A That is correct. And also the hostile environment that I know still exists at United Airlines against me, which I know that I would not be—I do not feel that I could check baggage or check into a flight and board an aircraft free from sabotage, interference, derogatory comments, or other harm.

. . . . .

Q All right. The comments Mr. Bibler made to you on that day, where were you at the time he spoke with you?

A In his office.

Q Was there anybody else in the office?

A No.

Q Was the door open or closed?

A Closed, I believe. I'm sure it was.

Q Because your complaint alleges that you were publicly reprimanded and harassed for assisting your disabled mother onto the airline.

A Well, Stan and Ron and Anita Hatton had gone to Ted. They all saw me go in there to talk to Ted. The walls are thin. When I came out, Ron and Dave, I believe were standing within two or three feet of the door. You can hear through the door.

Q So even though you were in an office with a closed door, you feel you were publicly reprimanded and harassed?

A Yes, because I was publicly pulled off of that airplane in front of other passengers, whom I knew. And in front of my mother, who was very upset by that incident. That was very embarrassing. And in front of the flight attendant that I had gained access from. Yes.

Q And Mr. Rossi is the one who came and spoke to you?

A He came and told me that Ted wanted to see me in his office. That I was to leave the airplane. That I was causing—that there was some trouble with my coworkers with me being on the airplane.

Q Mr. Rossi made all of those statements while he was on the airplane?

A That's correct. In front of my mother and the other passengers.

The Mr. Rossi that Fielder refers to is not the supervisor who allegedly reprimanded her; he was her former coworker whom she was dating and living with at the time of the incident. Bibler is the supervisor whom she claims reprimanded her in public.

The difference between Fielder's account and Bibler's is tone, not substance. Her own testimony about what Bibler said (as opposed to what she felt) was that he said her presence "was causing upheaval" and "showed poor judgment." There is no genuine issue of fact. She does not deny that he acknowledged her "rights" to do just what she did. Nor does she testify that he characterized what he said as a disciplinary reprimand. All she claims he did was tell her that the other workers were unhappy about her showing up, while they were a hand short and she was on sick leave, to escort her mother onto a plane. This evidence does not establish a genuine issue of material fact as to whether Fielder suffered an adverse employment action, consisting of a public disciplinary reprimand, within the 300 days.[9] Yet that is required to make out a prima facie case of retaliation under the statute.[10] The record establishes the absence of a genuine issue of fact, and consistent evidence that she was spoken to privately about offending other worker's feelings, while acknowledging her rights.[11]

Finally, the majority can point to no evidence at all that this private discussion about sensitivity to others' feelings was retaliation by the company for Fielder's sexual harassment complaint. Instead, the majority rests on sheer implausible speculation: "It is unlikely that they objected only to the act of escorting her mother" so "[i]t is an issue of material fact whether" the employees who complained "were retaliating for her protected activity."

Actually, there is no evidence whatsoever that the employees who went to Bibler's office to complain, "Liz," "Anita Hatton," and possibly a third, were trying to cause trouble for Fielder because she had accused M.C. of sexual harassment, nor would it matter if they were. The record is uncontradicted that the other workers were upset because Fielder was out on what was supposed to be some sort of medical leave, her shift was a person short because she was holding onto her slot despite being out on medical leave, and the employees resented her showing up and taking advantage of an employee's privilege when she was not showing up to help them do the work. There is nothing at all "unlikely" about that. People who work

---

9. *See Nunez v. City of Los Angeles,* 147 F.3d 867, 875 (holding that a supervisor's "scolding ... and threatening to transfer or to dismiss" are not adverse employment actions and explaining that "[m]ere threats and harsh words are insufficient"). *See also Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017 (8th Cir.1999) (holding that a supervisor's criticism and threat that the complainant would be *"fired for any subsequent exercise of poor judgment"* was not enough for an adverse employment action (emphasis added)); *Sanchez v. Denver Public Schools,* 164 F.3d 527, 533 (10th Cir.1998) (holding that a supervisor's oral threats and "ageist" remarks "did not rise to the level of a materially adverse employment action"); *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir.1998) (holding that an employee had not suffered an adverse employment action when "she was unfairly reprimanded for conduct she either did not engage in or should not have been responsible for"); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1301 (3rd Cir.1997) (holding that " 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' " following a sexual harassment complaint did not "rise to the level of the 'adverse employment action' required for a retaliation claim"); *Harrington v. Harris,* 118 F.3d 359, 366 (5th Cir.1997) (holding that "an employer's criticism of an employee, without more," is not an adverse employment action).

10. *See, e.g., Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 (9th Cir.1997); *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir. 1987).

11. I must disagree with Judge Fletcher's observation that "Fielder and United tell dramatically different versions of that episode." The difference is in what Fielder claims to have felt, not in what was said.

hard commonly resent it if they feel that a fellow employee is not pulling her share of the load.

Fielder did not put any deposition testimony in the record from the people who went to Bibler about why they went to Bibler; thus, she established no genuine issue of fact as to anyone's retaliatory motivation. Bibler said in his affidavit that even though Fielder was on medical leave, she was allowed to hold onto her shift, so "that shift was one employee short." He said in his affidavit that the other employees' concern was "that she was able to come to the airport to assist her mother onto a flight," while at the same time she "claimed not to be able to work." Thus, there is not even a genuine issue of fact about whether the other employees' complaints to Fielder's supervisor were an attempt to retaliate for her sexual harassment complaint.

Our cases make it clear that what Fielder offers is not enough to raise a material issue of fact. When an employer has offered legitimate business reasons for its actions, to avoid summary judgment, the nonmoving party must present evidence of pretext that is " 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex."[12] Our case law shows that "substantial" means quite a bit. In *Nesbit v. Pepsico, Inc.*,[13] we held that the plaintiff had not presented sufficient evidence to avoid summary judgment on his age discrimination claim even though a supervisor had commented that "we don't necessarily like grey hair" and the company president had said that "we don't want unpromotable fifty-year olds around."[14] Likewise, in *Nidds v. Schindler Elevator Corp.*,[15] we held that the plaintiff had failed to present sufficient evidence to avoid summary judgment on a retaliation claim despite a showing that the

District Supervisor had said he "intended to get rid of all the 'old timers' because they would not 'kiss my ass.' "[16] If the plaintiffs in *Nidds* and *Nesbit*, with significant evidence of discriminatory intent, cannot survive summary judgment, then it follows a fortiori that Fielder, who offers far less, cannot either.

So where does the majority get its genuine issue of fact? From imagined facts combined with two errors of law, with likely pernicious consequences for the law and for employers and workers. The majority supposes that (1) some coworkers thought Fielder was cruel and unfair in what she did to M.C.; (2) some coworkers expressed their feelings in spiteful interactions (all long before the 300 day period) with Fielder after she caused management to give M.C. a (genuine) disciplinary reprimand, a "final warning," and removed him from Fielder's shift; (3) a jury could conclude that the employees who went to Bibler when Fielder boarded the plane with her mother, "Liz" and "Anita Hatton," did so to retaliate for Fielder's having made a sexual harassment complaint; (4) a jury could conclude that Bibler's supposed public reprimand was retaliation for making a sexual harassment complaint.

The retaliation statute says that it is an unlawful employment practice for "an employer" to discriminate against an employee because the employee has made a discrimination charge. There is absolutely no evidence, none whatsoever, that Bibler's motivation in talking to Fielder about her showing up to put her mother on the plane was to discriminate against Fielder for filing sexual harassment charges against M.C. He had taken unsparing action against M.C. at the time, and it worked. Another employee who also made a sexual harassment complaint against M.C. obtained the transfer that Fielder now claims

12. *Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir.1998).

13. *Nesbit v. Pepsico, Inc.,* 994 F.2d 703 (9th Cir.1993).

14. *Id.* at 705.

15. *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912 (9th Cir.1996).

16. *Id.* at 915, 920.

she should have received. The uncontradicted evidence is that Bibler spoke to Fielder because the two women who came into his office were upset that they were a person short because of Fielder's claimed disability, for which she was getting sick leave and workers' compensation, yet she was well enough to come to the airport and put someone on the plane. Fielder presented no evidence that Bibler, her supervisor, ever did any of the nasty things she accuses her coworkers of.

So, in the absence of any evidence that Bibler was retaliating against Fielder for her having charged M.C. with sexual harassment, how does the majority convert their conversation into a discriminatory labor practice? It creates a new rule, "[s]o long as the conduct has the capacity of being considered retaliatory, it becomes an issue for the fact finder." [17] That conflicts with the controlling rule in cases like this one that requires "specific" and "substantial" evidence.[18] If the majority's rule were the rule, Nidds and Nesbit would have gone the other way. The majority compounds this legal error with the theory that maybe Fielder's coworkers would not have spoken to Bibler but for their remaining hostility to her. It is the *coworkers* whom the majority thinks a jury could find were retaliating.

The law does not provide for a remedy against the company for coworkers' negative sentiments. It does where the coworkers retaliate, management knows about it, and management does nothing. Had Fielder claimed and produced evidence to show that, within the 300 day period, coworkers had done such things as not providing ordinary mutual assistance with heavy loads, that she complained to management, and that management had allowed the retaliation to go on, then she would have a case that could go to a jury.

That is what a coworker retaliation claim is about. But Fielder presents no such claim or evidence.

Fielder's claim, which the majority seems to accept, is that there was a "continuing violation" under *Draper v. Coeur Rochester Inc.*[19] because it was a fair inference that some coworkers still did not like her and M.C. had not been fired. Perhaps they did not, but that is not enough. The "continuing violation" doctrine is sharply limited by *Ricks*. There the Supreme Court held that there was *no* continuing violation, even though the complainant was still on the job within the limitations period, and even though his employer could have changed its position and kept him instead of terminating him at the end of his terminal contract. Fielder's argument, that the discrimination continues even when she is not there because the "passive hostile conditions created by [M.C.'s] looming and unrestricted presence ... continued," [20] cannot be reconciled with *Ricks*. The majority relies on *Draper*, but it has no bearing on this case. In *Draper*, we held that the plaintiff could sue for a continuing violation because she had presented sufficient evidence that the harassing conduct continued until the date of discharge, which fell within the limitations period.[21] Here the harassment did not continue into the limitation period; it stopped long before the 300 day limitations period started, and Fielder did not work at any point during the limitations period.

The majority also relies on *Draper* to find a constructive discharge. Again, it has no bearing on this case. In *Draper*, the plaintiff complained twice to management about her supervisor's sexual harassment, but it did not stop, so she felt forced to quit; we held that she could sue for constructive discharge where the construc-

17. A Slip Opinion at 986.

18. *See, e.g., Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir.1998); *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996); *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir.1994).

19. *Draper v. Coeur Rochester Inc.,* 147 F.3d 1104 (9th Cir.1998).

20. A Plaintiff's Brief at 23.

21. *Draper,* 147 F.3d at 1109.

tive discharge occurred in the 300 day limitations period. Fielder established no genuine issue of fact on her constructive discharge complaint, because M.C.'s harassment that she said made her job intolerable had stopped long before the 300 day period. So had the coworkers' alleged retaliatory acts that she claimed made the workplace intolerable, because she did not work there at all during the 300 day period. She did not resign while working with the allegedly retaliating coworkers. She resigned when her workers' compensation disability pay and her medical pay ran out, and continued to hold her slot on her shift until then. Yet nothing during that period could establish the requirements for constructive discharge, because she was not at work or subject to any working conditions that were so intolerable that she was forced to quit.

Our decisions on constructive discharge emphasize that the decision to leave work must occur while the intolerable working conditions exist. In *Montero v. Agco Corp.,*[22] we held that an employee could not bring a claim for constructive discharge when she had left work four months after the harassing behavior had ceased. Likewise, in *Steiner v. Showboat Operating Co.,*[23] we held that an employee could not bring a claim for constructive discharge when the employer had fired the alleged harasser two and one-half months prior to her resignation. "[I]n order to constitute constructive discharge, harassment must be intolerable *'at the time of the employee's resignation.'* "[24]

Fielder formally resigned on May 10, 1995, after she had been away from the alleged hostile work environment for over a year. Her last day of work was April 20, 1994, and her last physical presence at the airport was when she boarded the plane with her mother, the previous September,

eight months before. On May 10, 1995, she was not subject to "intolerable conditions" at her workplace. She was not subject to *any* conditions at her workplace, because she was not even there. Fielder, unlike the plaintiff in *Draper,* could not have decided when she quit that "she can't take it anymore." She had not been "taking it" for over a year. Fielder cannot reinstate her right to sue for constructive discharge by an official resignation more than a year after she had left work because of the alleged intolerable working conditions. The decision to leave work must coincide with the intolerable working conditions.

As a practical matter, a sexual harassment complaint is likely to generate some ill feeling from the coworker accused of it and others who think the complaint was ill founded. The short statute of limitations Congress imposed advances the important purpose of labor peace. So long as a sexual harassment complaint is pending, the individuals in the workplace are likely to be talking about it at work, avoiding coworkers whom they think are "on the other side," stirring their side up with long, intense, night-time phone calls, worrying about the litigation, and building files to advance their positions. Promotion of labor peace motivates much of National Labor Relations Act jurisprudence.[25] Likewise getting discrimination cases done with promotes labor peace. Effectively repealing the statute of limitations, as the majority does in this factually and legally strained decision, will cause cases to fester and generate friction in the workplace for years, because the claim is never barred. Any contact between the employee and the workplace, even after she has quit working there, establishes a genuine issue of fact for a retaliation claim on the basis that the

**22.** *Montero v. Agco Corp.,* 192 F.3d 856, 861 (9th Cir.1999).

**23.** *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994).

**24.** *Id.* (quoting *Brady v. Elixir Industries,* 242 Cal.Rptr. 324, 328, 196 Cal.App.3d 1299 (Ct. App.1987) (emphasis in original)).

**25.** *See Auciello Iron Works, Inc. v. NLRB,* 517 U.S. 781, 785, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996).

coworkers probably still do not like her, under today's decision. The majority's decision is contrary to the statute, and contrary to the Supreme Court's construction of the statute in *Delaware State College v. Ricks.*[26]

The majority's decision creates the risk of tremendous unfairness to employers. An employer can be held liable for long past unlawful conduct that it had absolutely nothing to do with. The 300 days does not run so long as some employees may have bad feelings about the complainant under today's "continuing violation" theory.

The majority's strained decision also imposes extraordinary, and possibly unconstitutional, burdens on workers at a company accused of sexual harassment. Today's decision treats their unfriendliness toward a complainant as retaliation (all the refusal to assist, etc., was long before the 300 days). The majority points to such things as their not wanting the complainant to sit with them in the coffee shop during a break. The only thing management can do to protect itself from the law as so construed is to require the employees to socialize equally with a sexual harassment complainant, regardless of how they feel, and not to say how they feel. Government enforcement agencies will compel management to do that, under today's decision.

The First Amendment entitles people to be free to say what they think about a complainant and to associate with whom they like. Certainly the government can require their employers to prohibit retaliation in the course of workplace duties, such as helping with heavy loads, or refusing to talk to her when the job requires communication. But when they are not performing workplace duties, employees' free speech and associational rights cannot constitutionally be sacrificed by government compulsion to serve the goal of preventing retaliation.[27] The government is not entitled to make people act as though they like each other.

A hypothetical case illustrates why not. Suppose a racist complainant falsely charged a black man with sexual harassment, and told her coworkers that she had filed the false charges to get him out of there because of his race. In any decent workplace, her coworkers would tell her what a terrible person they thought she was, refuse to sit with her at lunch or invite her to social events, and shun her except where work required contact. The statute says that "the employer" cannot retaliate against her "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing,"[28] but nowhere does it say that the other employees have to pretend they still like her, lie about their feelings, and continue to socialize with her as though she had not done the evil act. Nor could it under the Constitution. Yet under today's opinion, civil rights enforcement agencies will compel private employers to require that coworkers treat the hypothetical complainant with as much social warmth as they treat other coworkers.

Elimination of the statute of limitations is also another heavy weight piled onto people who want to get jobs. Until the companies are very sure that prospective employees are not dangerous to them, they are likely to avoid hiring them. Employers have done that in the past few years by hiring people as "temps," and treating them as employees of temporary employment agencies, or hiring them for purportedly temporary jobs that end automatically, but are really long probation periods. By increasing the litigation risk to employers today, we further discourage companies from making offers of genuine, full, secure employment. Our decision today

**26.** *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

**27.** *Brooks v. City of San Mateo,* 214 F.3d 1082, 1092–93 (9th Cir.2000).

**28.** 42 U.S.C. § 2000e–3(a).

teaches practical employers to hire temps or contract the work out.

By inventing facts, and inventing law, we have done considerable harm. I dissent.

