Carolina HESS, Plaintiff,

v.

MULTNOMAH COUNTY and Bonnie Teschner, Defendants.

No. CIV–00–1483–ST.

United States District Court,
D. Oregon.

Dec. 7, 2001.

Thomas M. Steenson, Steenson Schumann Tewksbury & Rose, PC, Portland, OR, for plaintiff.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiff, Carolina Hess ("Hess"), filed this action on November 1, 2000, alleging that her former employer, Multnomah County, and her former supervisor, Bonnie Teschner ("Teschner"), constructively terminated her because she is Hispanic and female. The Second Claim for Relief alleging gender discrimination has been dismissed (docket # 23). The remaining First Claim for Relief alleges race discrim-

ination, "including the creation of a hostile work environment," in violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq* ("Title VII"), 42 USC § 1983, and ORS 659.030(1)(a) and (b).

This court has federal question jurisdiction under 28 USC § 1331. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Defendants' Motion for Summary Judgment (docket #25) is now before the court. For the reasons that follow, the motion is granted in part and denied in part.

### *LEGAL STANDARDS*

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324, 106 S.Ct. 2548. The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir.1999). A " 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' " does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific*

*Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630–31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The Ninth Circuit has found, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

The Ninth Circuit has set a high standard for granting summary judgment in employment discrimination cases. "[W]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.) (internal citations and quotations omitted), *cert denied*, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996).

### *FACTS*

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Hess. A review of the parties' facts, as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[1] reveal the following facts.

1. Both parties have submitted documents

with various attachments, namely Plaintiff's

## I. *Hess's General Background*

Hess is Hispanic; she was born in Mexico and lived there until she was 20. Hess Dec (Pltf's Ex L), ¶ 2. She received an Associate's Degree in Dental Assisting in 1977, a Bachelor's Degree in Education in 1983, and held various positions teaching Spanish from 1984–1989. *Id.*, ¶¶ 3–4. Hess is active in the community, particularly regarding cultural issues. *Id.*, ¶ 5.

## II. *Multnomah County Health Department*

On June 5, 1989, Hess began working part-time as a Health Information Specialist ("Specialist") for the Multnomah County Health Department in the Information and Referral Unit ("I & R"). *Id.*, ¶ 6. Specialists access a computer database to provide callers with referrals on health programs and related information, translate for non-English speaking clients, and collect and input information for the database. Teschner Aff (Defs' Ex. 1), ¶¶ 5–6.

In 1994, Hess's position became full-time and until 1996, she was the only full-time bilingual Spanish speaking I & R Specialist. Hess Dec, ¶¶ 6–7. For the last several years of her employment, she was the most senior I & R Specialist and often trained new Specialists. *Id.*, ¶¶ 8, 10. She was also assigned special tasks and provided emergency translations. *Id.*, ¶ 8.

In 1996, Bonnie Teschner ("Teschner"), who is Caucasian, became supervisor of I & R and Oregon SafeNet, a second unit that provides similar services. Teschner Aff, ¶ 2. She directed and controlled the day-to-day activities of the units by setting work schedules, assigning work, au-

thorizing training, and preparing formal performance evaluations. Hess Dec, ¶ 13. Teschner considers herself to be a midmanager with limited authority to discipline her subordinates. Teschner Depo (Pltf's Ex K), pp. 65–66.

### A. *Evaluations*

During Hess's tenure, the Director of Multnomah County Health Department, other county employees and community members acknowledged their appreciation of her employment contributions. Hess Dec, ¶ 10. Before becoming Hess's supervisor in 1996, Teschner had heard only good things about Hess. Teschner Depo, pp. 11–12.

From 1989–1996, prior to Teschner's becoming her supervisor, Hess's performance evaluations were either "exceeds expectations" or "outstanding." Pltf's Exs Q–T. In 1996, Teschner lowered Hess's performance evaluation and initially intended to rate her as "meets expectations" or "exceeds expectations." *Id.*, Ex U. After Hess protested, Teschner agreed to upgrade four portions of the evaluation and included two "outstanding" ratings, with an overall rating of "outstanding." *Id.*, Exs U, V; Hess Dec ¶ 14. Teschner believes a subsequent change in the final evaluation was a typographical error. Teschner 2nd Aff (Defs' Ex. 31), ¶ 7. Regardless, Hess acknowledged it and attached a disagreement letter. Pltf's Ex. V.

Teschner was on medical leave from about January 1999 through September 1999, returned part-time until approxi-

Evidence in Opposition to Defendants' Motion for Summary Judgment ("Pltf's Ex") (docket # 33) and the Affidavit of Agnes Sowle in Support of Defendants' Reply to Plaintiff's Memorandum in Opposition ("Defs' Ex") (docket # 39). Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit, declaration or page(s) of the deposition transcript. All other citations are to the exhibit number of the parties' submissions.

mately December 1999, and resumed full-time thereafter. Hess Dec, ¶ 17(r). In March 1999, during Teschner's absence, acting supervisor Lisa Simpson ("Simpson") rated Hess as "outstanding." Pltf's Ex W. Hess felt that Simpson was "respectful and accommodating, which was completely different from the way Ms. Teschner treated [her]." Hess Dec, ¶ 17(r).

## B. *Discipline*

Hess was never formally disciplined or reprimanded. Teschner 2nd Aff, ¶ 18. However, on several occasions, Hess felt she was being reprimanded. Hess Dec, ¶ 15.

### 1. *Dental Clinic Incident*

On April 23 1996, Dental Clinic Manager Dr. Craig Baumeister wrote to Hess in response to a comment that Hess made with respect to the dental clinic's inappropriate treatment of pulling teeth instead of providing fillings. Defs' Ex 3. A copy of this letter was sent to Valerie Whelan ("Whelan"), Teschner's supervisor, and the SE Dental Staff. *Id.* Since Hess felt she did not have the opportunity to explain herself, Hess obtained permission from Teschner to meet with Dave Houghton ("Houghton"), a Cross–Cultural Committee member, the following day at 8:00 a.m. Hess Dec, ¶ 17(b). Houghton was delayed and, with Teschner's permission, Hess met with him later. *Id.* Because Hess left at a time that Teschner felt she had not approved, Teschner so advised Hess and on April 29, 1996, sent a memorandum to all of the Specialists, detailing and reminding them to follow the "absence procedure" when leaving the phones unattended. *Id.,* ¶ 17(c); Teschner Dec, ¶ 11; Defs' Ex 9.

On June 13, 1996, Teschner, Dr. Baumeister, Jim Younger, and Hess met to discuss the alleged incident. Hess Dec, ¶ 17(e). Hess felt Teschner was accusatory and unsupportive, but ultimately the matter was dropped. *Id.;* Teschner Aff, ¶ 11.

### 2. *Letters of Support*

On May 1, 1996, Teschner emailed all the Specialists advising that performance evaluations would include input from third parties. Defs' Ex 11. In response, Hess gave Teschner a list of persons and agencies she regularly served. Hess Dec, ¶ 17(d). Within two-and-a-half months, Teschner received at least 10 letters commending Hess's work at Multnomah County. Pltf's Ex Y. Teschner told Hess that she was surprised that so many people would write letters on Hess's behalf, and used them only for the "interpersonal relations" category, for which Hess received an "outstanding" rating. Hess Dec, ¶ 17(d); Teschner Aff, ¶ 112; Pltf's Ex V, p. 1.

### 3. *Voice Mail*

To ensure that voice mail messages were clear and specific, Teschner occasionally asked employees to listen to and change messages of absent employees. Teschner Aff, ¶ 13. On November 25, 1996, Teschner instructed a bilingual Caucasian coworker, Bobbie Bowman ("Bowman"), to change Hess's voice mail message that was in Spanish and English because Teschner did not understand it. Hess Dec, ¶ 17(f). The initial message was left in a manner Hess was previously instructed to use, indicating that Hess was out of the office in training, when she would be back, and instructing the caller to leave a message. *Id.* The new message said "Carolina is out of the office." *Id.*

Subsequently, on December 6, 1996, Hess asked for and followed Teschner's instructions on voice mail message protocol. *Id.,* ¶ 17(g). Yet, her message was changed again. *Id.* Hess did not want coworkers to listen to her personal voice

mail messages, particularly regarding medical appointments or test results. *Id.* However, retrieval of messages was coded and no one, including Teschner, could have listened to Hess's personal messages. Teschner 2nd Aff, ¶ 9.

#### 4. *Micro–Managing*

On August 6, 1997, Teschner interrupted Hess while handling two calls, one being a Spanish speaking call on her personal line, and asked her why someone was waiting so long on the English speaking queue. Hess Dec, ¶ 17(h). Hess is a responsible and independent employee and did her job with little or no supervisory assistance. *Id.* However, Teschner questioned Hess's ability to work unassisted and reminded her that all calls should be done in six minutes. *Id.* Hess explained, as she had before, the difficulties in meeting this standard particularly since Spanish speaking calls generally take more time. *Id.*

The next day, after returning from the restroom, Hess found a note from Teschner instructing her to go to her office. *Id.,* ¶ 17(i). Hess went there only to be questioned why she was away from the phones for four minutes. *Id.* Hess never observed Teschner monitor the Caucasian employees' use of the bathroom. *Id.*

On October 28, 1997, Teschner disapproved of Hess assisting a Multnomah County employee walk-in who needed health-related information on the Hispanic population. *Id.,* ¶ 17(j). Also on that day, for workers' compensation purposes relating to Hess's arm pain, Teschner asked Hess to sign a modified job description document provided by Risk Management that Hess felt inaccurately indicated her job required limited computer use and allowed her to use only her left hand. *Id.,* ¶ 17(k); Teschner Aff, ¶ 16. Hess asked Teschner if she could answer the phones

without using the computer, but Teschner refused. Hess Dec, ¶ 17(k). Since Hess could not perform her modified job duties, Hess left work until November 24, 1997, when she was released back to work without limitation. (Teschner Aff, ¶ 16; Bover Aff Defs' Ex 13) ¶¶ 5–9.

In late December 1997,[2] Teschner changed desk duties and assigned Hess to serve an all English speaking line and to provide backup for the Spanish speaking line. Teschner Aff, ¶ 10. Hess was offered an all-Spanish speaking position, but decided to remain a bilingual Specialist. Hess Dec, ¶ 7. When Hess reminded Teschner about her concern for meeting the needs of Spanish speaking callers, Teschner responded sarcastically, "yes, I know of your passion to serve your community." *Id.,* ¶ 17(*l*).

On March 11, 1998, Teschner reminded Hess that breaking 10 minutes late is unacceptable, even though the phone lines were busy during her scheduled break. *Id.,* ¶ 17(n). Teschner also later scolded her for taking Spanish speaking calls, which she was expected to take only as backup. *Id.* A month later, Teschner again spoke with Hess about taking Spanish speaking calls. *Id.,* ¶ 17(p).

On September 13, 1999, Teschner told Hess that she did not know what to do with Hess because of her continuing arm problem. *Id.,* ¶ 17(s).

On January 24, 2000, Teschner reminded Hess to take her break on time. *Id.,* ¶ 17(aa). On February 10, 2000, Teschner sent an email to the I & R staff about an observation that someone did not wash her hands after using the bathroom, implying that Teschner was monitoring their bathroom use. *Id.,* ¶ 17(dd). Teschner emailed Hess a notice on March 3, 2000,

---

**2.** Hess alleges that this occurred on December 25, 1997. Hess Dec, ¶ 17(*l*). Defendants respond that no one worked on Christmas Day. Teschner 2nd Aff, ¶ 10.

for failing to answer calls until after the computer was fully open, a policy of which Hess was unaware. *Id.,* ¶ 17(ee).

### 5. *Training*

In 1997, Hess attended five computer training classes. Defs' Ex 16, p. 1. On March 6, 1998, Teschner denied Hess's request for time off for domestic violence training and treated her as if the denial was punishment. Hess Dec, ¶ 17(m). On March 25, 1998, Teschner denied Hess's request for computer training, "even though [she] had the time . . . and it would have assisted [her job skills] . . . and career development with the County in I & R." *Id.,* ¶ 17(*o*). Teschner, however, "allowed at least three Caucasian employees to take computer training similar to that which she denied [Hess]." *Id.* On May 28, 1998, Teschner refused Hess's request to attend an Oregon Health Plan meeting in Salem. *Id.,* ¶ 17(q). From 1998–1999, Teschner allowed Hess to attend three courses, including a course in how to use the web and proofreading and editing. Defs' Ex 16, p. 1.

On September 13, 1999, Teschner again denied Hess permission to attend domestic violence training even though many clients were victims of domestic violence and Hess felt that it was important to understand their unique problems. Hess Dec, ¶ 17(s). Two days later, Teschner refused to change Hess's schedule to allow her to attend domestic violence training even though Hess offered to take vacation time and phone coverage was available. *Id.,* ¶ 17(t). Hess was often left alone to cover for other employees. *Id.*

Teschner also refused Hess's request for payroll training, but granted Caucasian employees such requests. *Id.,* ¶ 17(u). On November 19, 1999, Teschner denied Hess's request for computer training. *Id.,* ¶ 17(v). Instead, Teschner arranged for on-call coverage to allow for a Caucasian coworker to receive this training. *Id.*

### 6. *Community Activities*

In response to a management policy change, on May 28, 1998, Teschner emailed only Hess to inform her that Multnomah County was revoking a 1994 written agreement allowing Hess to use up to 20% of her paid time for work-related community meetings, many of which were focused on Hispanic issues. *Id.,* ¶ 17(q); Defs' Ex 17. This change in policy was made by Teschner's supervisor and applied to all employees. Craighead Aff (Defs' Ex 18), ¶¶ 4–6.

Because Hess wanted to continue her community activities and rest her arm, in the fall of 1999, Whelan approved changing her work schedule to .8 FTE, or four days per week. Hess Dec, ¶ 17(w). However, at the end of November 1999, Teschner told Hess she had to choose between a five day or a 2½ day per week position, offering to divide the work into two and three days weekly. *Id.;* Defs' Ex 36. On December 9, 1999, Hess worked a five day work week, which Teschner scheduled without consulting Hess. Hess Dec, ¶ 17(x). By December 12, 1999, Hess opted for the 2½ day schedule, but Teschner had Hess continue working full-time until January 12, 2000. *Id.,* ¶ 17(y). Teschner then changed Hess's work schedule to five days per week, but four hours daily, which Hess found unsuitable. *Id.* When Hess complained, Teschner replied, "As a manager, I have the right to change schedules. I don't even have to tell you about this, I did so out of courtesy." *Id.* Hess was certain that Teschner was trying to force her to resign by making her schedule difficult and unfair. *Id.*

### III. *Discrimination Complaints*

On January 24, 2000, Hess met with Rosemary Kirwin–Alford, an investigator

with the County's Affirmative Action Office ("AAO") to discuss Teschner's discriminatory practices. *Id.*, ¶ 17(bb). A week later, Teschner curtly questioned Hess about the AAO meeting. *Id.* Hess felt this questioning was a form of retaliation and since Teschner offered no assistance in resolving the issues, Hess filed a discrimination complaint with the AAO on February 1, 2000. *Id.*; Pltf's Ex M. Two days later, Teschner sent an email to all staff informing them of the race discrimination complaints and advised employees to feel comfortable discussing any relevant information with the investigator. Defs' Ex 19. Hess felt this email was retaliatory and threatening. Hess Dec, ¶ 17(cc). She also noticed that the Caucasian coworkers began isolating themselves from her, which made the work atmosphere cold and hostile. *Id.*

Other minority coworkers felt that Teschner discriminated against them as well.

### A. *Spencer*

Nancy Spencer, an African American,[3] thought Hess was a model employee who acted professionally on and off the telephone. Spencer Dec (Pltf's Ex A), ¶ 16. Spencer never saw Hess do anything to warrant Teschner's criticism or harsh treatment. *Id.*

Spencer also had problems with Teschner, which Spencer believed originated from Teschner's "animus towards racial minorities and her devaluing of ethnic diversity." *Id.*, ¶ 3. After Whelan resigned in the fall of 1999 and Teschner returned from medical leave, Spencer noticed that Teschner began criticizing her more harshly. *Id.*, ¶ 4. Teschner eliminated Spencer's workday flexibility, yet did not comment when Caucasian Specialists regularly adjusted their schedules. *Id.*

Spencer believed that Teschner had her "favorites," and "targeted" others who "were by and large minorities." *Id.*, ¶ 3. Teschner treated minorities less favorably in a number of ways, including: (1) belittling and talking down to minorities; (2) being extremely nasty, disrespectful, and unprofessional toward minorities; (3) having little patience for their questions; (4) changing rules and procedures then reprimanding the minorities for following the original policy; (5) being stern, militaristic, and rigid; (6) watching, spying on, and excessively monitoring them; and (7) instructing them to remain at their desks at all times. *Id.*, ¶ 5. Spencer spoke with the union about Teschner's discriminatory treatment of minorities. *Id.*, ¶ 7.

On January 5, 2000, Teschner gave Spencer written notice for being absent from work without prior approval. Pltf's Ex Z. Apparently, Spencer had received approval for time off from Teschner's predecessor, but failed to follow Teschner's procedures for taking time off. Spencer Dec, ¶¶ 8–11. Then, Spencer missed her return flight and requested a day off. *Id.*, ¶ 9. However, since Teschner expressed hostility and disapproval, Spencer worked from 1:00–4:30 p.m. *Id.*

Once it became clear to Spencer that Teschner's discriminatory treatment was going to continue, on January 19, 2000, she filed a discrimination complaint with the AAO. *Id.*, ¶ 11; Pltf's Ex B. Five days later, Teschner withdrew the unapproved absence from work charge against Spencer. Spencer Dec, ¶ 12.

Spencer felt that Teschner's February 3, 2000, email announcing the discrimination charges "singled out and ostracized the minority employees, creating an 'us vs. them' atmosphere in the workplace that made [her] feel extremely uncomfortable

---

**3.** Spencer does not declare that she is Afri-

can–American. *See* Hess Dec, ¶ 17(ff).

[as though] she was entering hostile territory every day [she] came in to work." *Id.*, ¶ 14. Approximately four months after Spencer's complaint was filed, she tendered her resignation with the County. Pltf's Ex C. She did so because she was frustrated with Teschner's unfair treatment of her and the County's slow response to her complaint. Spencer Dec, ¶ 15. She was angry that Teschner was not held accountable and continued to treat her disrespectfully. *Id.*

**B. *Lim***

Karina Lim ("Lim"), who is Hispanic, began working the Spanish speaking line as an on-call Specialist in April 1999 and was hired full-time eight months later. Lim Dec (Pltf's Ex GG), ¶¶ 1, 3. There was a large volume of calls on the Spanish speaking line and she was busy, thus Hess took some of the overflow calls. *Id.*, ¶ 3.

Lim noticed that Teschner was unfriendly and hostile towards her, yet she praised the Caucasian Specialists and allowed them more opportunities for training and career advancement. *Id.*, ¶ 6. Once Teschner yelled across the room at Lim for arriving at 8:00 a.m., when she was supposed to be seated. *Id.*, ¶ 5. Meanwhile, Teschner said nothing to Bowman, who had arrived at the same time. *Id.* Lim believed she was performing satisfactorily, never had a complaint from a client, and Teschner never spoke to her about performance issues. *Id.*, ¶¶ 7¶ 8. However, on April 7, 2000, Lim was called into Teschner's office and shocked to be presented with a termination letter purportedly based on performance problems. *Id.*, ¶ 8.

**C. *Nguyen***

Nguyen began working for Multnomah County Health Services on July 1, 1993, and became a permanent employee on October 7, 1994. Teschner 2nd Aff, ¶ 118. Prior to becoming her supervisor, Teschner had heard only good things about

Nguyen. Teschner Depo, p. 15. In April 2000, Nguyen also filed a discrimination complaint with the AAO against Teschner. *Id.* at 115; Hess Dec, ¶ 21.

**D. *Moon Rose Dougherty***

Moon Rose Dougherty ("Dougherty"), who is married to a Hispanic and considers herself to be Hispanic, began as an on-call Specialist. Teschner Depo, pp. 81–82. After she became full-time, she requested a work schedule amenable to her school schedule and, although having the authority to adjust schedules for employees, Teschner refused to do so. *Id.* Dougherty threatened to quit and Teschner ultimately terminated her. *Id.*

**E. *Teschner's Response***

In response to the discrimination complaints, Teschner held a meeting on March 17, 2000, allowed no one to speak, set forth a long list of prohibitions, and stated that she was the one who made the decisions. Hess Dec, ¶ 17(ff). During the meeting, Teschner also stated "My back is to the wall. I am angry and when I am angry I fight back. And I am going to fight back. I have considered leaving, but I am not going to leave." *Id.* Teschner only answered one Caucasian Specialist's question. *Id.* Hess felt that Teschner was again threatening her, and other minority employees, because of their formal discrimination complaints. *Id.*

On March 23, 2000, Teschner emailed a policy prohibiting printing out work schedules, which some Specialists had been doing to keep accurate accounting. *Id.*, ¶ 17(gg). Hess felt she needed to print and keep a hard copy of her original work schedules to be able to prove she was timely and reliable. *Id.* The next day, Teschner spotted Hess looking in Nguyen's desk drawer. *Id.*, ¶ 17(hh). Hess was responding to coworker Nguyen's request to look for her keys, and instead of

waiting for an explanation, Teschner accused Hess of inappropriateness. *Id.* Later that day, Teschner sent an email reprimanding Hess for this. *Id.* Teschner also emailed the staff about an "unidentified employee" who looked through a coworker's drawers, but the staff was aware of who was involved because Teschner first scolded her publicly. *Id.*

On April 3, 2000, Teschner sent the staff a memorandum discussing the group's dysfunction and implementing a new policy that prohibited logging onto the computer until the start of a shift. *Id.*, ¶ 17(ii). Since the telephone lines opened at 8:00 a.m., Specialists would have to log calls by hand while their computers opened which is what Hess was reprimanded for doing a month earlier. *Id.* Four days later, Teschner called Hess at home and inquired why she called in sick. *Id.*, ¶ 17(jj). Hess felt Teschner was calling to harass her because, prior to filing the discrimination complaint, she had never shown any personal interest in her. *Id.*

### F. *Multnomah County's Response to Discrimination Complaints*

After conducting its investigation of the discrimination complaints filed by Spencer in January 2000, Hess in February 2000, and Nguyen in April 2000, the AAO issued its findings on July 20, 2000. Pltf's Exs E, F, 1, J, N, O. First, the AAO found clear and convincing evidence to substantiate only discriminatory, harsh, and demeaning treatment toward the complainants, other minorities, and Caucasian men. *Id.* Second, the AAO found evidence to substantiate "[t]he allegations of closer monitoring and different interpersonal treatment toward minorities and Caucasian men . . . by a preponderance of evidence." Pltf's Ex O. Lastly, the AAO found that this different treatment "can impact the terms, conditions or privileges of employment for the less favored group." *Id.* The AAO issued the following identical recommendations:

1) The organization should consult with the manager regarding these findings. 2) The organization should take corrective action to address what appears to be harsh and demeaning treatment on the part of the manager of minority employees and Caucasian male employees. 3) Once corrective action is taken, the organization should follow up within 30 days and 90 days to determine if the problematic interpersonal treatment and interactions have improved.

*Id.*

Teschner remembers Spencer and Hess informally complaining to her about being treated differently from other employees. Teschner Depo, pp. 84–85. She also heard from several other Specialists that Nguyen was upset about how Teschner treated her differently. *Id.* at 85. While Teschner did not report or discuss complaints about a perceived differential treatment to Human Resources, she discussed Hess's complaints with her supervisors. *Id.* at 85–86.

Teschner was never disciplined. *Id.* at 115. Despite the AAO's recommendation, she was not put on a performance improvement plan. *Id.* Additionally, since the AAO's findings, Teschner still has not attended diversity training. *Id.* at 115–16.

Beginning in March 2000, Joy Belcourt ("Belcourt") was the Acting Support Services Director and Teschner's supervisor. Belcourt 2nd Aff (Defs' Ex 51), ¶¶ 1–2. Belcourt realized that I & R was struggling under Teschner's supervision, but believed it was unrelated to race discrimination. *Id.*, ¶ 5. Instead, she believed rule changes, procedures, and style contributed to the perception that employees were treated differently. *Id.*, ¶ 7. In an effort to improve teamwork, Belcourt established regular meetings with Teschner between May and June 2000, asked that written communications to staff go through her first, and reevaluated the distribution of

off-phone duties. *Id.*, ¶ 8. The meetings with Belcourt represent Multnomah County's only corrective action. Teschner Depo, p. 126. Meanwhile, Teschner believes there was no basis for Spencer, Hess, or Nguyen to file formal discrimination complaints. *Id.* at 140.

#### IV. *Hess's Resignation*

Finding the work environment hostile, particularly after Teschner learned of Hess's discrimination complaint, Hess took a medical leave of absence beginning on April 5, 2000. Hess Dec, ¶ 22. On August 4, 2000, Multnomah County wrote to Hess explaining that it was unable to accommodate the doctor's order placing Hess on a "permanent work restriction from having Bonnie Teschner as [her] supervisor" and nor was it "required to eliminate the essential job function of working under [her] assigned supervisor." Defs' Ex 37. Multnomah County did invite Hess to meet in August and September 2000 to discuss options for Hess's return to work. *Id.* On September 5, 2000, Hess filed a complaint with Oregon's Bureau of Labor and Industries ("BOLI"). Defs' Ex 40, p. 3.

In January 2001, Hess learned that Teschner was on medical leave. Hess Dec, ¶ 24. Thus, Hess agreed to return to work on January 5, 2001, on what she thought was a trial basis. *Id.* Through discovery in this case, Hess learned that Multnomah County had not taken any remedial action against Teschner and Hess was concerned that Teschner would continue to discriminate or retaliate against her once she returned from her medical leave. *Id.*

On January 24, 2001, Hess was ill but stayed at her workstation until the acting supervisor found the Acting Support Services Co–Director, Gary Sawyer, who immediately approved her leave request. *Id.*, ¶ 25; Sawyer Aff (Defs' Ex 42), ¶ 4. As a result of this incident, and due to her concern about what would happen when Teschner returned, Hess followed her doctor's order and took another medical leave at the end of January 2001. Hess Dec, ¶ 25. On February 27, 2001, Hess gave notice of her resignation effective on March 1, 2001, her return to work date. *Id.*

#### *DISCUSSION*

The remaining First Claim for Relief alleges violations of Title VII, 42 USC § 1983, and ORS 659.030(1)(a) and (b), based on two theories of race discrimination, namely disparate treatment and a hostile work environment in. Defendants maintain that all of these claims are time barred (Motions 1, 2, and 3). Also, defendants move to dismiss all of Hess's claims for failure to state ultimate facts sufficient to constitute a claim (Motion 4). Lastly, defendants move to dismiss the Title VII and Oregon claims against Teschner and to substitute Multnomah County for Teschner (Motions 5 and 6).

With respect to Motions 1, 2, and 3, Hess argues that the continuing violation doctrine saves the claims that would otherwise be time barred. In response to defendants' Motion 4, Hess asserts that she has sufficiently stated her claims and is entitled to findings of law pursuant to FRCP 56(d). Lastly, Hess explains that she has not sought to recover under Title VII and ORS 659.030 against Teschner individually, rendering Motions 5 and 6 moot.

For the reasons that follow, Motion 4 is granted against Hess's disparate treatment claims and Motions 5 and 6 are denied as moot. In all other respects, defendants' Motion for Summary Judgment (docket # 25) is denied.

#### I. *Statute of Limitations (Motions 1, 2, and 3)*

Defendants asserts that: (1) the Title VII claims are time barred as to incidents

occurring prior to November 10, 1999, because Hess filed her BOLI complaint on September 6, 2000 (Motion 1); (2) the ORS 659.030 claims are time barred as to incidents occurring prior to September 6, 1999, because the BOLI complaint was filed on September 6, 2000 (Motion 2); and (3) the 42 USC § 1983 claims are time barred as to incidents occurring prior to November 1, 1998, because Hess filed this lawsuit on November 1, 2000 (Motion 3). For the reasons that follow, none of Hess's claims are time barred.

### A. *Title VII (Motion 1)*

Title VII requires a complainant to file charges with the Equal Employment Opportunity Commission ("EEOC") within 180 days after the alleged unlawful employment practice occurred. 42 USC § 2000e–5(e)(1). If the complainant instead first institutes proceedings with a state or local agency, the period of limitations for filing a charge with the EEOC is extended to 300 days. *Id.*

Hess filed her BOLI complaint on September 6, 2000. Thus, her Title VII claims may include incidents occurring more than 300 days earlier (prior to November 10, 1999) only if she can show a continuing violation by demonstrating a common type of discrimination or a common kind of employment action.

The continuing violation doctrine allows courts to consider conduct that would ordinarily be time-barred. *Anderson v. Reno,* 190 F.3d 930, 936 (9th Cir.1999). A plaintiff first "must demonstrate that the untimely incidents are part of a pattern of discrimination and that the [defendant] continued this pattern into the relevant limitations period." *Id.* A plaintiff can

make the requisite showing "by presenting evidence that [the defendant] engaged in a 'systematic policy of discrimination' or by presenting evidence of a series of related discriminatory acts directed at her by [the defendant's] personnel." *Id,* quoting *Sosa v. Hiraoka,* 920 F.2d 1451, 1455–56 (9th Cir.1990); *Fielder v. United Airlines Corp.,* 218 F.3d 973 987–88 (9th Cir.2000).

Systematic discrimination involves "demonstrating a company wide policy or practice" and most often occurs in matters of placement or promotion. *Green v. Los Angeles County Superintendent of Schs.,* 883 F.2d 1472, 1480 (9th Cir.1989). In contrast, a "serial violation," or a series of related acts, "is established if the evidence indicates that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." *Morgan v. Amtrak,* 232 F.3d 1008, 1015 (9th Cir.2000). Where the plaintiff alleges a series of related acts, "[the] question . . . boils down to whether sufficient evidence supports a determination that the 'alleged discriminatory acts are related closely enough to constitute a continuing violation.'" *Fielder,* 218 F.3d at 987–88, citing *Green,* 883 F.2d at 1480–81.

▮ Here the many incidents related by Hess are serial in nature, spanning several years and all involve the same actor, Teschner. Under the minimum *Fielder* threshold, Hess's alleged discriminatory acts prior to the statute of limitations period relate closely enough to those acts within the statute of limitations period to constitute a continuing violation. Therefore, Hess's Title VII claims are not time barred.

### B. *ORS 659.030 (Motion 2)*[4]

▮ Under state law, an aggrieved party may file a BOLI complaint. ORS

---

4. Oregon has recently revised its statutes re-

lating to unlawful employment practices. *See*

659.040(1). If she does so, the subsequent complaint must be filed within one year after the unlawful practice. *Id.* Thus, Hess's claims under Oregon law may include incidents prior to September 6, 1999, only if she can show a continuing violation.

■ As discussed above, Hess's claims relate closely enough to constitute a continuing violation for purposes of Title VII. ORS 659 .030 mirrors Title VII, its federal counterpart. The legal standard and burdens of proof for discrimination claims under ORS 659.030 and Title VII are the same. *Snead v. Metropolitan Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1087 (9th Cir.2001). Because ORS Chapter 659 "was modeled after Title VII ... federal cases interpreting Title VII are instructive." *Harris v. Pameco Corp.,* 170 Or. App. 164, 176, 12 P.3d 524, 532 (2000), citing *Mains v. II Morrow, Inc.,* 128 Or. App. 625, 634, 877 P.2d 88, 93 (1994). Moreover, the Oregon Supreme Court has not explicitly rejected the continuing violation doctrine for claims made under ORS 659.030. Accordingly, Hess's ORS 659.030 claims are not time barred as to incidents occurring prior to September 6, 1999.

### C. *42 USC § 1983 (Motion 3)*

■ The Ninth Circuit also evaluates otherwise time barred 42 USC § 1983 claims within the continuing violation doctrine context under Title VII. *See DeGrassi v. City of Glendora,* 207 F.3d 636, 644 (9th Cir.2000). Since 42 USC § 1983 does not provide a statute of limitations, the limitations period is borrowed from state law and these claims are characterized as personal injury actions for statute of limitations purposes. *Davis v. Harvey,* 789 F.2d 1332, 1333 (9th Cir.1986). Oregon's general tort statute provides a two-year statute of limitations. ORS 12.110(1).

2001 Oregon Laws Ch. 621 (HB 2352), OR-Legis 621 (2001). All references are to the

Since Hess filed her complaint on November 1, 2000, her 42 USC § 1983 claims may be based on incidents occurring prior to November 10, 1998, only if she can show a continuing violation and demonstrate a common type of discrimination or a common kind of employment action. As discussed above, Hess's many complaints involve the same actor and relate closely enough to constitute a continuing violation. Accordingly, none of Hess's 42 USC § 1983 claims are time barred.

### II. *Motion to Dismiss Race Discrimination Claims (Motion 4)*

Next, defendants seek dismissal of all of Hess's race discrimination claims based on violations of Title VII, 42 USC § 1983, and ORS 659.030(1)(a) and (b) because Hess cannot: (1) establish a sufficient *prima facie* case of disparate treatment based on race; (2) demonstrate a hostile work environment; or (3) present either direct or circumstantial evidence sufficient to raise a triable issue of fact as to whether defendants proffer a legitimate, nondiscriminatory reasons for its employment decisions.

### A. *Disparate Treatment Claim*

#### 1. *Legal Standard*

■ As a preliminary matter, employment discrimination remedies under Title VII and 42 USC § 1983 claims are parallel and the same elements of proof apply to establish a *prima facie* case. *Bator v. Hawaii,* 39 F.3d 1021, 1028 n. 7 (9th Cir. 1994); *Sischo–Nownejad v. Merced Cmty. Coll.,* 934 F.2d 1104, 1112–13 (9th Cir. 1991); *Knight v. Nassau County Civil Serv. Comm'n,* 649 F.2d 157, 161–62 (9th Cir.1981). Furthermore, the federal *prima facie* standards are identical to those

statute prior to this revision.

used in Oregon law. *Henderson v. Jantzen, Inc.,* 79 Or.App. 654, 657, 719 P.2d 1322, 1322, *rev denied,* 302 Or. 35, 726 P.2d 934 (1986). Oregon rejects the burden-shifting mechanism in federal claims, but does examine the evidence beyond the *prima facie* case. *Snead,* 237 F.3d at 1090–93. As discussed below, Hess does not establish a *prima facie* claim for disparate treatment, but does meet that burden with respect to her claims for hostile work environment. Therefore, all three claims will be considered together.

To establish a *prima facie* case, a plaintiff must offer evidence that " 'give[s] rise to an inference of unlawful discrimination.' " *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998), quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). When deciding a summary judgment motion, the court views the facts in the light most favorable to the plaintiff, and the amount of evidence which the plaintiff is required to produce to create her *prima facie* case is "very little." *Sischo–Nownejad,* 934 F.2d at 1110–11.

To survive summary judgment on her disparate treatment claims, Hess must offer proof that she: (1) is a member of a protected class; (2) was performing her job satisfactorily; (3) suffered an adverse employment action; and (4) others not of her protected class were treated more favorably. *See Godwin,* 150 F.3d at 1220, citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The employee's protected characteristic must be shown to have "actually played a role . . . and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant, who must proffer a legitimate, nondiscriminatory reason for its employment decision. *Chuang v. University of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1123–24 (9th Cir.2000); *Godwin,* 150 F.3d at 1220. If the defendant provides a "legitimate, nondiscriminatory reason for its employment decision, the . . . presumption of unlawful discrimination 'simply drops out of the picture.' " *Wallis v. JR Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994), citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At that point, a plaintiff can avoid summary judgment simply by producing evidence which raises a genuine issue of material fact regarding the truth of the employer's proffered reasons:

> As the Supreme Court recently reaffirmed, a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. . . . While the plaintiff always retains the burden of persuasion, . . . he does not necessarily have to introduce "additional, independent evidence of discrimination" at the pretext stage.

*Chuang,* 225 F.3d at 1127 (9th Cir.2000), quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), and citing *St. Mary's Honor Ctr.,* 509 U.S. 502, 113 S.Ct. 2742 at (1993).

### 2. *Hess's Prima Facie Case*

Although Hess is a member of a protected class and was performing her job satisfactorily, defendants argue that Hess cannot establish a *prima facie* case of disparate treatment because she fails to show that she suffered an adverse employment action or was treated less favorably than non-Hispanics. With the minimal burden

and all inferences drawn in her favor at the *prima facie* stage, this court concludes that Hess did suffer an adverse employment action, but has failed to show that she was treated less favorably than similarly situated employees outside of her protected class.

#### a. *Adverse Employment Action*

"Not every employment decision amounts to an adverse employment action." *Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 869 (9th Cir.1996). Instead, an adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).[5]

■ Hess argues that the following alleged incidents constitute the requisite adverse employment actions: an unjustly low performance evaluation; denial of training allowed to Caucasian employees; change in her work assignment in a manner that impacted her racial identity in the workplace; and revocation of her prior employment privileges. Additionally, she argues that she was subjected to rules and procedures that made her performance more onerous and was prohibited from speaking at staff meetings. She also claims that Multnomah County's failure to take remedial action and its refusal to assign her to a position not under Teschner's supervision led to her forced resignation. None of these incidents, except her forced resignation, amount to an adverse employment

action sufficient to state a *prima facie* case.

Hess claims that Teschner gave her a lower performance evaluation than her former supervisor. A low performance evaluation which does not affect the employee's work does not amount to an adverse employment action. *See Kortan v. California Youth Auth.,* 217 F.3d 1104, 1112–13 (9th Cir.2000) (holding that a poor job evaluation does not constitute an adverse employment action where the evaluation was ultimately revised by another supervisor). Furthermore, when Hess challenged her performance evaluation, Teschner upgraded the evaluation. No reasonable person would conclude that Hess's evaluation was low when she scored an overall rating of "outstanding," which is the highest rating given.

Hess has offered no evidence that any of the training she was denied would have resulted in a promotion or led to a salary increase or that non-Hispanics who were allowed to take the training received any promotion or increased salary as a result. Nor does Hess allege that her career was significantly impaired by not taking the training. In fact, as explained at oral argument, Specialists have little internal opportunity for career development, salary increase, or promotion due to training. Thus, Hess has not demonstrated any adverse employment action flowing from the denial of the training that she sought.

Hess also has failed to demonstrate that any change in her work assignment constituted an adverse employment action. Hess makes no showing that by taking calls in English or Spanish significantly

---

**5.** In a retaliation action, an adverse employment action is defined more broadly to include "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v.*

*Henderson,* 217 F.3d 1234, 1242–43 (9th Cir. 2000), quoting EEOC Compliance Manual § 8, Retaliation, ¶ 8008 (1998). Because Hess asserts no retaliation claim, her reliance on *Ray* is misplaced.

impacted her duties as a Specialist. Hess also asserts that in December 1997, Teschner refused to allow her to answer Spanish-speaking calls and just three months later, Teschner mandated her to take backup of Spanish-speaking calls. Teschner maintains that she never changed Hess's assignment from the English desk with Spanish backup. In either event, Hess suffered no adverse employment action since her job duties were not significantly impacted.

Hess also maintains that Multnomah County's decision no longer allowing her to attend community activities on work time was an adverse employment action. However, Hess's managers did not consider her community activities to be one of, or even related to, her job duties. The result of the management decision was to place Hess in the same position as her co-workers. No one was allowed to use work time for personal meetings. The refusal by management to allow her more privileges than her co-workers is not an adverse employment action.

The rules and procedures of which Hess complains were the same rules and procedures required of all Specialists and do not constitute adverse employment actions. Hess's prohibition from speaking at one staff meeting certainly cannot be said to amount to a materially adverse employment action.

Hess also argues that she was never threatened with discipline by any supervisor other than Teschner. However, according to the undisputed facts, Hess was never given an oral or written reprimand or threatened with discipline by Teschner.

■ Hess also permeates her list of complaints with allegations of "harsh and demeaning" treatment by Teschner. "Harsh and demeaning" conduct cannot constitute an adverse employment action in the absence of some tangible harm. *See e.g., Strother,* 79 F.3d at 869; *Steiner v.*

*Showboat Operating Co.,* 25 F.3d 1459, 1465 n. 6 (9th Cir.1994).

■ The only tangible harm that Hess suffered is her forced resignation because Multnomah County failed to take remedial action by following the AAO's recommendations or by accommodating her doctor's order to not work under Teschner's supervision. A forced resignation, or constructive discharge, occurs when an employer intentionally creates, or knowingly permits, conditions so intolerable that they effectively force an employee to resign. *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110 (9th Cir.1998). If proven, a forced resignation or constructive discharge is legally equivalent to a termination and therefore can constitute an adverse employment decision for purposes of establishing a *prima facie* case of discrimination.

However, Hess's claim of forced resignation due to her intolerable working conditions that Multnomah County failed to correct is nothing more a claim of constructive discharge due to a hostile work environment. As discussed above, none of the individual incidents alleged by Hess prior to her resignation constitutes an adverse employment action by itself. Instead, it is the cumulation of incidents over a period of years that led Hess to conclude that she could no longer work under Teschner. That claim is simply a hostile work environment claim wrapped in different nomenclature. Although Hess's forced resignation is an adverse employment action, her discrimination claim for disparate treatment premised upon that forced resignation is necessarily subsumed into her hostile work environment claim.

### b. *Less Favorable Treatment*

■ Even if any of the alleged incidents by itself is an adverse employment action, Hess fails to satisfy the fourth

and final element of *McDonnell Douglas* that she was treated less favorably than employees outside her protected class. Before considering disparate treatment comparisons, Hess must show how other employees at Multnomah County "were similarly situated in all relevant respects." *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988).

The evidence that Hess offers to satisfy this prong of her *prima facie* case lacks any factual basis. Hess fails to provide any information specifying who was treated more favorably and how. "[P]urely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment." *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir.1988).

For example, the policies and procedures that Hess believes singled out minorities applied to all of the Specialists, not just to Hess. The email Teschner sent to all of the Specialists concerning the discrimination complaints filed against her does not amount to differential treatment because it merely requests that the Specialists answer the investigator's questions.

Countering Hess's conclusory allegations is defendants' evidence that the Caucasians whom Hess alleges were treated more favorably did not hold the same job duties or position as Hess and were not similarly situated. For example, the people who received the training that Hess was denied held different positions or off-phone assignments. *See* Teschner Aff, ¶¶ 21, 26; Hess Dec, ¶ 8. Additionally, another Caucasian employee working .5 FTE was allowed to work 2½ days per week instead of four hours daily because the management's policy change required all Specialists to work either full or half time. Teschner Aff, ¶ 27. Hess was not singled out for differential treatment.

Spencer stated that Teschner's targets "were by and large minorities," which suggests that some targeted individuals were not minorities. Furthering this theory, the AAO's findings indicate that Teschner treated minorities and Caucasian men less favorably. Since Caucasian men were also treated unfavorably, Hess has failed to show that Teschner only treated Hispanics less favorably. Moreover, these AAO findings, like an EEOC summary letter, are insufficient to create a genuine issue of material fact sufficient to withstand a motion for summary judgment. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283–1284 (9th Cir.2000).

Simply stated, Hess has failed to provide any evidence as to who was treated more favorably or how she was treated less favorably than her non-Hispanic co-workers. Accordingly, Hess fails to establish a *prima facie* case for her disparate treatment claims.

### B. *Hostile Work Environment Claim*

#### 1. *Legal Standard*

According to Oregon appellate courts, "evidence that conduct created an intimidating or a hostile or an offensive working environment suffices" to prove a hostile work environment and the standard to be applied is an objective one which takes into account the "totality of the circumstances." *Fred Meyer, Inc. v. Bureau of Labor & Indus.*, 152 Or.App. 302, 307–09, 954 P.2d 804, 807–08 (1998).

Federal law governing a claim of hostile work environment discrimination is more fully developed. Under federal law, a plaintiff must offer evidence that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment,'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), quoting *Meritor Sav. Bank, FSB v.*

*Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The relevant inquiry is whether a reasonable person "with [plaintiff's] characteristics" could find the work environment to be intimidating, hostile, or offensive based on the totality of the circumstances. *Meltebeke v. Bureau of Labor & Industries,* 322 Or. 132, 145, 903 P.2d 351, 358 (1995).

A number of factors affect whether the discriminatory conduct is sufficiently hostile, abusive, intimidating, or offensive to result in a hostile work environment. Courts examine factors such as the frequency of the discriminatory conduct, its severity, whether it was targeted at the plaintiff versus being part of the general milieu of work behavior, whether it involved physical contact, threats, or humiliation versus a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Nichols v. Azteca Rest. Enter., Inc.,* 256 F.3d 864, 872 (9th Cir.2001). " '[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' " *Id* at 872, quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Conduct must be extreme with "tangible results" in order to amount to a change in the terms and conditions of employment. *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275; *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Fred Meyer,* 152 Or.App. at 309–10, 954 P.2d at 808.

Additionally, "courts may properly look to guidelines issued by the [EEOC] for guidance when examining hostile environment claims." *Ellison v. Brady,* 924 F.2d, 872, 876 (9th Cir.1991), citing *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399. Those guidelines provide:

> Since "hostile environment" harassment takes a variety of forms, many factors may affect this determination, including: (1) whether the conduct was verbal or physical, or both; (2) how frequently it was repeated; (3) whether the conduct was hostile and patently offensive; (4) whether the alleged harasser was a co-worker or a supervisor; (5) whether others joined in perpetrating the harassment; and (6) whether the harassment was directed at more than one individual.

Policy Guidance on Current Issues of Sexual Harassment, EEOC Notice No.—915–050, p. 14, (March 19, 1990).

The Ninth Circuit recognizes that no specific number of incidents of harassment must occur in order to show the existence of a hostile work environment. *Woods v. Graphic Communications,* 925 F.2d 1195, 1201–02 (9th Cir.1991). Instead, the facts supporting claims for a hostile work environment generally fall on a continuum "somewhere between forcible rape and the mere utterance of an epithet" and "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison,* 924 F.2d at 877–78.

### 2. *Analysis*

██ Not one of the incidents involving Hess and Teschner is sufficiently severe to alone support a racially hostile work environment claim. *See Woods,* 925 F.2d at 1202 (finding sufficient severity in instructions to wash his hands in a urinal and the letters "KKK" written on a machine near the employee's work area). However, these incidents were frequent and, if truly a result of Teschner's racial animus, may be sufficiently pervasive to pollute the atmosphere with racial tension and create a hostile work environment. The critical issue is whether these incidents were premised on race or whether they occurred as a result of Teschner's militaristic, rigid man-

agement style directed equally towards all of her Specialists regardless of race.

While not much in the record supports Hess's hostile work environment claim, the record is not devoid of racial overtones. The declarations of Hess, Spencer, and Lim provide some observations on how they perceived and experienced Teschner's racial animus toward minorities as opposed to non-minorities. Moreover, while Hess bears the burden of showing a hostile work environment, one glaring omission from defendants' voluminous record is a declaration from any minority Specialist who did not perceive any racial animus by Teschner. Equally glaring is the lack of a declaration from any Caucasian Specialist who felt that Teschner had a harsh and demeaning management style.

Buttressing the declarations submitted by Hess are the AAO's findings, Teschner's threatening and harsh statements at the meeting held in response to the discrimination complaints, and Multnomah County's failure to implement the AAO's three recommendations or take any remedial measures to ensure that Hess and other minorities would not be further subjected to discriminatory treatment by Teschner. This evidence leaves many questions more appropriate for a factfinder, based upon a full record. *Schnidrig,* 80 F.3d at 1410.

While not following the AAO's recommendations, Belcourt held regular meetings with Teschner between May and June 2000, asked that written communications to staff go through her first, and reevaluated the distribution of off-phone duties. Though unlikely, a factfinder may find these remedial measures sufficient. Multnomah County also agreed to meet with Hess to work out a plan so Hess could return to work. Yet, Multnomah County never agreed to arrange for her to be supervised by someone other than Teschner. Additionally, Multnomah County

did not mandate that Teschner attend training in diversity. Hess ultimately was forced to resign because she felt that things had not changed and she did not want to work under Teschner's supervision.

Hess offers some evidence that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Harris,* 510 U.S. at 21, 114 S.Ct. 367. For example, Hess provides examples of Teschner's "ambient" presence as a supervisor and "persistent" interactions with Hess. *See Fielder v. UAL Corp.,* 218 F.3d 973, 986 (9th Cir.2000), *petition for cert filed,* —— U.S. ——, 122 S.Ct. 2583, 153 L.Ed.2d 773, 69 USLW 3619 (Mar 7, 2001), citing *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1108 n. 1 (9th Cir. 1998). The incidents and perceptions of racial animus as described by Hess, Spencer, and Lim, also support a theory of pervasive racial discrimination. Accordingly, defendants' motion for summary judgment on the racially hostile work environment claims is denied.

### III. *Dismissal of Teschner (Motions 5 and 6)*

Under FRCP 12, defendants move to dismiss the Title VII and ORS 659.030 claims against Teschner for failure to state ultimate facts sufficient to constitute a claim (Motion 5) and, pursuant to ORS 30.265(1), moves to substitute Multnomah County for Teschner in Hess's Oregon claims and dismissing them as to Teschner (Motion 6).

In her reply, Hess clarifies that she is not seeking "to recover against Teschner individually on her Title VII or ORS 659.030" claims. Accordingly, defendants' motions 5 and 6 are denied as moot.

#### IV. *Special Findings*

Pursuant to FRCP 56(d), Hess requests the court to make special findings with respect to the AAO reports and Multnomah County's failure to take remedial action. Because defendants dispute these facts, as discussed above, that request is denied.

### ORDER

For the reasons stated above, defendants' Motion for Summary Judgment (docket # 25) is granted in part and denied in part. Defendants are granted summary judgment against Hess's First Claim for Relief premised on a disparate treatment theory (part of Motion 4). In all other respects, the motion is denied.